[No. C054523. Third Dist. June 30, 2008.]

JASON CHRISTIAN et al., Plaintiffs, Cross-defendants and Appellants, v. GIULIANO FLORA et al., Defendants, Cross-complainants and Respondents.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part I of the Discussion.

COUNSEL

Heritage Law Group, Timothy A. Charshaf for Plaintiffs, Cross-defendants and Appellants.

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen, C. Athena Roussos for Defendants, Cross-complainants and Respondents.

OPINION

**BLEASE, Acting P. J.**—Plaintiffs, owners of three parcels (28, 29 and 30) in a subdivision known as Latrobe Hills, El Dorado County, brought this action to quiet title in an easement across defendants' parcels, that provided access to Latrobe Road, by incorporation in their deeds of a recorded 1977 subdivision parcel map (figure 2, appen., *post*, at p. 557).

The issue arises because the 1977 parcel map was amended in 1979, pursuant to Government Code former section 66499.20¾, to resubdivide two of the parcels (14 and 15) subject to the map (figure 3, appen., *post*, at p. 558) and to create a road easement along their joint boundary connecting to the easement granted plaintiffs by incorporation of the 1977 parcel map in their deeds. At the same time, quitclaim deeds were recorded that extinguished the portion of the easement shown on the 1977 parcel map along the boundary of parcels 8, 14 and 15, at least with respect to parcels 28 and 29. As a consequence, defendants' predecessors in interest thereafter lacked the authority to deed an easement over that portion to parcels 28 and 29. No road was ever built over the original easement along parcels 14 and 15, but there is a dirt road over the easement depicted in the 1979 parcel map.

Defendants argue, and the trial court held, that plaintiffs are not entitled to an express or implied easement over the road depicted in the 1979 map. We disagree.

We shall hold that where, as here, parcels in a subdivision are resubdivided by a subsequent parcel map, recorded in compliance with the Subdivision Map Act (Map Act; Gov. Code, § 66410 et seq.), the new parcel map amends the provisions of any previously recorded parcel map made in compliance with the Map Act. Since the owners of parcels 28 and 29 were misled to believe, by the incorporation of the 1977 parcel map in their deeds, that they had an easement connecting the western portion of their parcels to Latrobe Road, defendants are estopped to claim the 1979 parcel map did not constitute an

amendment of the 1977 parcel map. Because there can be only one final recorded subdivision map, the 1979 map amended the 1977 map, and because the Latrobe Hills conditions, covenants and restrictions (CC&R's) are deemed to have incorporated the amended map, parcel 30 also has the right to use Dragon Point Road.

We shall conclude that the deeds of parcels 28, 29 and 30 are deemed to have incorporated the changes made to the 1977 parcel map by the 1979 parcel map.

We shall reverse the decision of the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

The properties involved in this lawsuit consist of six contiguous parcels located in the Latrobe Hills subdivision, El Dorado County. The location of the properties in the larger subdivision is illustrated in figure 1 (see appen., *post*, at p. 556). The properties involved are designated as parcels 8, 14, 15, 28, 29, and 30. Plaintiffs own parcels 28, 29, and 30. Defendants own parcel 14. The owners of parcels 8 and 15 are not parties to this action.

CC&R's for the Latrobe Hills subdivision were recorded on July 11, 1977, to which were attached a parcel map for the subdivision dated March 1977. (Figure 2 (see appen., *post*, at p. 557) is a portion of the map attached to the CC&R's.) This parcel map was apparently later recorded on September 26, 1977, at book 17, page 61 of the El Dorado County Parcel Maps, as referenced in many of the grant deeds in evidence, although the parties have not put into evidence a copy of the recorded map.

The Latrobe Hills CC&R's state in pertinent part that every person who is a record owner of a parcel in the Latrobe Hills subdivision is a member of the Latrobe Hills Homeowners Association, Inc., and subject to the CC&R's. The CC&R's further state that nonexclusive easements and rights of way for roadways are delineated on the "Record of Survey or parcel map," and that such easements are reserved on and to the parcels in the subdivision, and are appurtenant to each parcel in the subdivision. Moreover, each parcel owner, by accepting a deed in the subdivision, agrees to pay annual assessments and special assessments to be used in part for the improvement and maintenance of the roads in the subdivision. No record of survey or parcel map is set forth in the CC&R's as the governing map, but an otherwise unrecorded parcel map dated March 1977 was recorded with the CC&R's.

On the parcel map attached to the CC&R's, and presumably on the map recorded on September 26, 1977, the configuration of parcels 14 and 15 was as shown in figure 2 (see appen., *post*, at p. 557). An easement was delineated on the map running from Latrobe Road in a southwesterly direction and following the western perimeter of parcels 8, 14 and 15, then continuing south along the western perimeter of parcels 28 and 29 and ending at parcel 30. The map indicated the easement was for a "nonexclusive road and public utilities easement."

At the time the CC&R's were recorded, all of the property in the Latrobe Hills subdivision was owned by Pacific Mutual Investment Company (PMI), which was a general partnership consisting of Bruce Bartleson and Hubert Weindel.

The first parcel sold to one of plaintiffs' predecessors in interest was parcel 30. It was sold by PMI in August 1978 (before the 1979 amendment), and the property described in the deed was "PARCEL 30, as said Parcel is shown on that certain Parcel Map . . . filed September 26, 1977 . . . ." Parcel 30 was thereafter transferred to its current owner, plaintiff Theodore Happe, on October 15, 1979.

The next of plaintiffs' parcels to be sold was parcel 28, in May 1979 (shortly after the 1979 amendment). The deed from PMI described the property sold as "PARCEL 28, as said Parcel is shown on that certain Parcel Map . . . filed September 26, 1977." No mention was made of the 1979 map amendment. The deed also referenced the recorded CC&R's. Parcel 28 was transferred by a series of mesne conveyances, and is currently owned by Barry and Jason Christian.

The last of plaintiffs' properties to be sold was parcel 29, which was sold by PMI to Bartleson on October 18, 1979. The deed to Bartleson described the property as parcel "29 as said [parcel is] shown on that certain Parcel Map . . . filed September 26, 1977 . . . ." Again, no mention was made of the 1979 amended map. Parcel 29 was transferred by a series of mesne conveyances, and is currently owned by Dwayne and Cecelia Crawley.

Each deed repeated the property description of the first deed with reference to the 1977 map. However, the last of the deeds to the Christians regarding parcel 28 listed the address of the property in the legal description as "7201 Dragon Point Road."

On March 2, 1979, at the request of Bartleson, a 1979 map of parcels 14 and 15 was recorded. It appears that, as of the date of this map, parcel 14 was owned by Bartleson, and parcel 15 was owned by PMI. Several of the parcels

surrounding these two had by this time been sold to purchasers in the subdivision. In particular, parcel 8 in the Latrobe Hills subdivision had been sold to Charles Fulbeck.

The 1979 parcel map changed the boundary between parcels 14 and 15 from a straight line running east and west, to the irregular boundary that appears in figures 1 and 3 (see appen., *post*, at pp. 556, 558). Additionally, the 1979 map omits any mention of the easement in the 1977 map, but delineates a new "non-exclusive road and public utilities" easement running along the boundary between parcels 14 and 15, that connects to the portion of the easement along the boundaries of parcels 28, 29 and 30 shown on the 1977 map. This road is commonly referred to as Dragon Point Road.

The planning director's certificate on the 1979 parcel map states that the map "conforms with the requirements of [Government Code[1]] section 66499.20 3/4, [a part] of the Subdivision Map Act." In 1979, this section of the Map Act provided in pertinent part as follows: "Subdivided lands may be merged and resubdivided without reverting to acreage by complying with all the applicable requirements for the subdivision of land as provided by this division and any local ordinances adopted pursuant thereto. The filing of the final map or parcel map shall constitute legal merging of the separate parcels into one parcel and the resubdivision of such parcel, and the real property shall thereafter be shown with the new lot or parcel boundaries on the assessment roll. . . . Any streets or easements to be left in effect after the resubdivision shall be adequately delineated on the map. . . . The filing of the map shall constitute legal merger and resubdivision of the land affected thereby, and shall also constitute abandonment of all streets and easements not shown on the map." (Stats. 1977, ch. 234, § 12, pp. 1038–1039.)

The day before the 1979 map was recorded, March 1, 1979, four quitclaim deeds were recorded between the owners of parcels 14 and 15 (Bartleson and PMI) and the owners of parcel 8 (Fulbeck). Each of these quitclaim deeds contains the following statement, "The sole purpose of this Deed is to eliminate of record the 25.00 foot in width non-exclusive road and public utilities easement . . . ." Each deed then describes the easement as being either "the Northwesterly line of said Parcel 14 . . . ," "the Southeasterly line of said Parcel 8 . . . ," "the West line of said Parcel 15 . . . ," or "the Northwesterly, Southerly and Westerly lines of said Parcel 14 shown on said Parcel Map . . . ."

---

[1] References to an unnamed section are to the Government Code.

As a consequence of the quitclaim deeds to the owners of parcel 8 by PMI and Bartleson (defendants' predecessor in interest) made coincident with the filing of the 1979 parcel map on March 1, 1979, PMI lacked the subsequent authority to deed the full easement to parcels 28 and 29 as shown on the 1977 parcel map. For this reason, these parcels lacked the access to Latrobe Road shown on the 1977 parcel map.

Defendants Giuliano Flora and Angela Amato are the current owners of parcel 14. Their deed describes their parcel as the one shown "on the Parcel Map filed March 2, 1979 . . . ." Parcel 14 was first transferred from Bartleson to a purchaser in the subdivision on March 2, 1979, the same day the 1979 map was recorded, and the deed to the purchaser described the property with reference to the 1979 map.

Defendants assert, and plaintiffs do not deny, that the Crawleys began using Dragon Point Road in 2001, and the Christians' predecessor in interest began using the road in 2004 for the purpose of constructing their homes. There is no independent evidence of these facts in the record. Plaintiffs assert, and defendants do not deny, that the original western road easement was never graded. There is no independent evidence of this fact in the record. No evidence was admitted to show when Dragon Point Road was graded for use as a road.[2]

Plaintiffs filed this action to quiet title over the original western easement (shown on the 1977 map), and for injunctive relief. Defendants cross complained to quiet title to the easement over Dragon Point Road, for injunctive relief, and to prevent trespass, effectively putting at issue the easement across Dragon Point Road. On appeal plaintiffs do not assert a right to use the portion of the original easement along the western and northwestern boundaries of parcels 8, 14 and 15. (See fn. 4, *post.*)

Bartleson was the only witness to testify at the court trial. Unfortunately, his memory of relevant events was sketchy. He did not remember the 1979 parcel map. He did not remember owning parcel 14 or selling it. He did not remember whether the parcels south of parcel 14 (parcels 15, 28, 29, and 30) had been sold at the time the 1979 parcel map was recorded. He did not recall filing the four quitclaim deeds in 1979 that eliminated the original easement shown on the 1977 parcel map. He admitted writing a letter in 1985 to the Latrobe Hills homeowners association regarding the Dragon Point Road easement, but did not have any independent recollection of the facts stated in the letter or of writing the letter.

---

[2] Bartleson wrote a letter to the Latrobe Hills homeowners association in 1985, wherein he claimed the road was graded after parcels 30 and 28 were sold, but before parcel 29 was sold. However, this letter was not admitted into evidence.

Even though Bartleson stated he did not remember writing the letter, he testified he was aware when he drafted the letter in 1985 of a dispute with another neighbor about the use of Dragon Point Road. Bartleson did recall that the original easement was located where it was so that it would not go through anyone's parcel, but would only go around the perimeter of the parcels. Bartleson did not recall whether the original easement was ever moved, but stated he had had no intention to create two easements.

The trial court excluded Bartleson's 1985 letter to the homeowners association upon defendants' objection that the letter was hearsay, not properly authenticated (it was unsigned), and irrelevant.[3]

After a court trial, the judge rendered judgment for defendants on the complaint and for defendants/cross-complainants on the cross complaint.[4] No statement of decision was requested.

## DISCUSSION

### I

### Exclusion of Bartleson's Letter[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II

### Easement over Dragon Point Road

Defendants argue that plaintiffs cannot claim an express easement over Dragon Point Road because their deeds make no reference to such an

---

[3] The pertinent portion of the letter states: "Dragon Point Road was designed primarily as a secondary access road for parcels 28, 29, and 30. While those parcels have access on Latrobe Road, a decision was made to provide a secondary access to provide better building sites on the top of the hill, if the buyers so chose. The grading for Dragon Point Road had not commenced when the other roads were being worked on because there was a tentative sale of the 60 acres from the Consumnes River north (Parcels 30, 29, and 28), and, had the prospective buyer completed his offer, Dragon Point Road would have been abandoned. The expected sale of the 60 acres fell through, and soon after, parcels 30 and 28 were sold. In order to market better parcel 29, we decided against abandonment of Dragon Point Road and graded the road."

[4] We find the trial court's written ruling inconsistent in light of the judgment. The trial court granted judgment for defendants on plaintiffs' complaint to quiet title in the original easement, yet it stated that it was "clear" that plaintiffs have an easement "as identified in the CC&R's, per the parcel map filed in 1977." In any event, as noted, we review the judgment, not the ruling, and plaintiffs do not claim on appeal that they are entitled to the easement described in the 1977 map.

[*] See footnote, *ante*, page 539.

easement; that plaintiffs cannot claim an implied easement because two of the requirements of an implied easement (use of the easement prior to the severance of ownership and reasonable necessity) are not present; and that there is no evidence the easement was relocated, because the dominant and servient estates never mutually consented to such a relocation.

We requested supplemental briefing from the parties on the legal effect of former section 66499.20¾ (upon which the 1979 map was based) on plaintiffs' right to the easement over Dragon Point Road created by the 1979 parcel map. Defendants responded that plaintiffs have an existing easement based on the 1977 map and that the dominant and servient estates had not mutually consented to a relocation of that easement. The answer turns in part on the provisions of former section 66499.20¾.

█ Former section 66499.20¾[6] in pertinent part provided that "[s]ubdivided lands may be merged and resubdivided" and that "[t]he filing of the [new subdivision] map shall constitute legal merger and resubdivision of the land affected thereby, and shall also constitute abandonment of all streets and easements not shown on the map." (Stats. 1977, ch. 234, § 12, pp. 1038, 1039.) It further provided that "[a]ny streets or easements to be left in effect after the resubdivision shall be adequately delineated on the [1979] map." (*Ibid.*)

In this case the only easement "adequately delineated" on the 1979 parcel map is Dragon Point Road. It is described as a "nonexclusive road and public utilities easement" which, as shown, connects Latrobe Road to the junction of the 1977 parcel map easement along the western edge of parcels 28, 29 and 30. At the same time the 1979 map was recorded, which abandoned the preexisting easement, defendant's predecessors in interest in parcels 14 and 15, Bartleson and PMI, and the owners of parcel 8 exchanged quitclaim deeds to "eliminate" the existing easement of record along the western and northwesterly edges of parcels 14 and 15, as shown on the 1977 parcel map.

The manifest inference to be drawn from these facts is that the purpose of the 1979 amendment of the subdivision parcel map was to substitute the easement known as Dragon Point Road for the easement along the edges of parcels 8, 14 and 15 shown on the 1977 parcel map.

Defendants necessarily argue that the filing of the 1979 map had no effect on plaintiffs' deeds, two of which postdated the 1979 parcel map change, because those deeds refer to the 1977 parcel map. We disagree.

---

[6] Former section 66499.20¾ has been amended and replaced by section 66499.20½, which provides: "The filing of the map shall constitute legal merger and resubdivision of the land affected thereby, and shall also constitute an abandonment of all public streets and public easements not shown on the map" provided certain procedural requirements are met.

The argument ignores the language of former section 66499.20¾ and the events involved in the recording of the 1979 parcel map. The section provides for the substitution of the easement shown on the 1979 map for any previous easement not shown on the 1979 map. Accordingly, defendants cannot assert the binding effect of both the new and the old easements along the boundaries of parcels 14 and 15.

Nor would it make sense to do so. First, the effect of the 1979 map was to reconfigure the boundary of parcels 14 and 15 so as to eliminate the western boundary of parcel 15 along which the 1977 easement ran. Second, the effect of the reference to section 66499.20¾ in the 1979 parcel map was to "adequately delineate" only those streets and easements left after the amendment. Third, this was confirmed by the exchange of quitclaim deeds that "eliminate[d]" the portion of the 1977 easement along both parcels 14 and 15 and the boundary of parcel 8.

For these reasons the recordation of the 1979 map pursuant to former section 66499.20¾ operated as a matter of law to amend the recorded 1977 map of the Latrobe Hills subdivision and to substitute Dragon Point Road for the easement shown on the deeds and in the CC&R's referencing the 1977 map. Underlying notions of estoppel and the interpretation of ambiguous grant deeds support the result reached herein.

An estoppel may occur where the owner of the dominant parcel relies on the conduct or representations of the servient owner such that equity establishes an easement in order to prevent an injustice. (See 6 Miller & Starr, Cal. Real Estate (3d ed. 2002) § 15:45, p. 15-159.) In this case all three parcel owners (28, 29 and 30) relied on PMI's representation that a roadway easement existed from the western edge of their parcels across parcels 14 and 15 to Latrobe Road.

The owners of parcels 28 and 29, in particular, relied on the grant of a roadway easement from the subdivider that the subdivider had no authority to grant. After conveying an easement to parcel 30, but before resubdividing parcels 14 and 15, PMI and Bartleson took steps to eliminate the easement deeded to parcel 30 by filing the 1979 parcel map in accordance with former section 66499.20¾ and by filing quitclaim deeds. Thus, PMI had no legal right to convey the full easement shown on the 1977 parcel map in deeding parcels 28 and 29 to plaintiffs' predecessors because they no longer owned that portion of the easement on the boundary of parcels 8 and 14. Moreover, the 1979 parcel map, by virtue of former section 66499.20¾, eliminated the boundary along parcel 15 described in the 1977 map.

All three parcel owners (28, 29 and 30) purchased in reliance on the representation of PMI that they would have an easement for ingress and egress from the western portion of their property to Latrobe Road. PMI and Bartleson either took steps thereafter or already had taken steps to change the easement and move it to a different location. For these reasons defendants, as Bartleson's successors in interest, are estopped to deny the owners of parcels 28 and 29 a roadway easement along the boundary of parcels 14 and 15. (*Neff v. Ernst* (1957) 48 Cal.2d 628, 635 [311 P.2d 849].)

■ If there is any ambiguity in an express easement we interpret the grant of easement in accordance with the rules of construction codified by statute (*Machado v. Southern Pacific Transportation Co.* (1991) 233 Cal.App.3d 347, 353 [284 Cal.Rptr. 560]). In such case, we may look to surrounding circumstances and the relationship of the parties and the properties involved. (6 Miller & Starr, Cal. Real Estate, *supra*, § 15:15, p. 15-68; *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 522 [67 Cal.Rptr. 761, 439 P.2d 889].) The document must be interpreted to give effect to the mutual intent of the parties. (Civ. Code, § 1636.)

The ambiguity in the deeds granting easements to the owners of parcels 28 and 29 lies not in the words of the deeds, but in the fact that the deeds purported to grant easements the grantors had no right to convey, and that the map referenced in the deed no longer reflected the reality of the amended map for the subdivision. We therefore look to the subdivider's intent.

There is ample evidence of the subdivider's intent to grant an easement across Dragon Point Road. In addition to the fact that an amended map was recorded, there is other evidence in the record that PMI intended to move the easement from its original location. First, the 1979 easement, like the old easement, runs from Latrobe Road to the southwestern corner of lot 15, which is also the northwest corner of parcel 28. This is where it connects to the easement set forth in the original map, which runs south through parcels 28, 29, and 30. The only parcels in the subdivision that could benefit from an easement terminating at this particular point are parcels 28, 29, and 30. Second, we know that the Dragon Point Road easement was not simply a second easement created for the benefit of other parcels, because one of the few things Bartleson remembered was that he did not intend to create two roads through parcels 14 and 15. Also, we have evidence of his intent to extinguish the original easement through the quitclaim deeds and the provisions of section 66499.20¾, upon which the 1979 map is based.

Third, we know that the reason Bartleson located the original easement where he did was so it would be on the parcel boundaries and not run

through the interior of anyone's land. When Dragon Point Road was delineated on the 1979 map, its irregular path also became the boundary between parcels 14 and 15. Thus, Dragon Point Road does not run through the interior of either parcel, a factor Bartleson claims was important to him in creating the easement. Fourth, Dragon Point Road is a road named by the county. This indicates the road was not intended just as a private easement for the two servient parcels, but as a road for the entire subdivision, as provided in the CC&R's. Furthermore, the address for parcel 28 is 7201 Dragon Point Road, which indicates that the road extends south from the southwestern corner of parcel 15 along parcels 28, 29, and 30, showing that the new easement was intended to benefit these parcels. Fifth, after the reconfiguration of parcels 14 and 15, the original easement would burden only parcel 14, with no burden to parcel 15. Finally, we know that the original easement was never graded, whereas Dragon Point Road was graded.

All of these factors lead us to conclude that, when PMI sold parcels 28 and 29, it intended to convey a single easement across parcels 14 and 15, and that easement was located across Dragon Point Road. PMI's failure to include the amendment to the subdivision map when referencing the parcel was a mistake.

■ The amendment of the subdivision map also has consequences for the CC&R's based on the map. As one of the parcels in the Latrobe Hills subdivision, parcel 30 is entitled, as are all parcels in the subdivision, to use the roadway easements delineated on the subdivision map as amended. The interpretation of CC&R's is subject to the same rules governing the interpretation of contracts. (*Fourth La Costa Condominium Owners Assn. v. Seith* (2008) 159 Cal.App.4th 563, 575 [71 Cal.Rptr.3d 299].) Contracts, in turn are writings to be construed in accordance with substantially the same canons of interpretation as statutes. (*Verdier v. Verdier* (1953) 121 Cal.App.2d 190, 193 [263 P.2d 57].)

■ Rules of statutory interpretation govern how to apply a statute incorporating another statute that changes over time. (*Doe v. Saenz* (2006) 140 Cal.App.4th 960, 981 [45 Cal.Rptr.3d 126].) This is analogous to the Latrobe Hills CC&R's, which incorporated a parcel map that changed over time. Where a statute adopts by specific reference the provisions of another statute, the provisions are incorporated as they exist at the time of the reference and not as subsequently modified. Where the reference is general instead of specific, the referring statute takes the laws in their contemporary form and as they may be changed from time to time. (*Ibid.*) The determining factor in

whether a reference is general or specific is legislative intent in light of all relevant evidence. (*Ibid.*)

Here, the relevant evidence supports the conclusion that the subdivider intended the CC&R's to incorporate the subdivision map as it might be amended. We have already detailed the facts showing an intent to change the road easement in question from its original location to its current location at Dragon Point Road. Other facts also indicate an intent to incorporate changes to the map.

First, the map recorded with the CC&R's was not yet final because it had not been recorded. We assume that the subdivision CC&R's were intended to reflect the final recorded subdivision map. Second, the CC&R's do not specifically incorporate any specific map, implying that the map governing the CC&R's would be the final recorded map. Finally, it is clear from the language of the CC&R's that the intent was to provide that all of the property owners in the subdivision would both use and maintain all of the roadway easements located within the subdivision. It is inconsistent with this intent to assert that a change to the subdivision map resulting in the relocation of a roadway would not be incorporated into the CC&R's. Defendants would have us hold that the property owners have a duty to maintain a nonexistent roadway, but no right to use the existing roadway built by the subdivider.

We conclude the intent was to incorporate any changes to the subdivision map and, as there can be but one final map, that is the map to which the CC&R's refer. To be clear, the 1979 map did not completely replace the 1977 map. The 1979 map only made changes to parcels 14 and 15, changing the boundaries of those two parcels, eliminating the road easement on the western boundary of those parcels, and creating a new road easement running along the new boundary. The 1977 map continues to be valid, as amended by the 1979 map.

Finally, we conclude the owners of parcels 14 and 15 were sufficiently on notice of the easement rights across their property.

Defendants' deed to parcel 14 described their property with reference to the 1979 parcel map. That map shows a "non-exclusive road and public utilities easement" across Dragon Point Road. The map does not specify any dominant parcel or parcels for this easement. The map states that it is a redivision of parcels 14 and 15 of parcel map 17-61. Parcel map 17-61 is the

parcel map referred to in plaintiffs' deeds, as evidenced by the book and page number on which the map was recorded. Defendants were thus on notice that there was a nonexclusive road easement across their property for unnamed beneficiaries, and that the map creating that easement referenced an earlier recorded map.[7]

Also, defendants' parcel was subject to the CC&R's for Latrobe Hills, even though the CC&R's were not specifically referenced in their deed. (*Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 349 [47 Cal.Rptr.2d 898, 906 P.2d 1314].) As stated, the CC&R's provided that the roadway easements delineated on the parcel map were appurtenant to each parcel in the subdivision, and further provided that each property would pay an assessment for, inter alia, the maintenance of the roads.

■ In addition to the notice given by the CC&R's, we may infer that defendants were on notice that every parcel in the Latrobe Hills subdivision was entitled to the use of every road easement delineated on the 1977 subdivision map. This rule was set forth in *Tract Development Services, Inc. v. Kepler* (1988) 199 Cal.App.3d 1374, 1382 [246 Cal.Rptr. 469], as follows: " 'When a lot conveyed by a deed is described by reference to a map, such map becomes a part of the deed. If the map exhibits streets and alleys it necessarily implies or expresses a design that such passageway shall be used in connection with the lots and for the convenience of the owners in going from each lot to any and all the other lots in the tract so laid off. The making and filing of such a plat duly signed and acknowledged by the owner, . . . is equivalent to a declaration that such right is attached to each lot as an appurtenance. A subsequent deed for one of the lots, referring to the map for the description, carries such appurtenance as incident to the lot.' [Citations.] . . . *Furthermore, the right to an easement created in this manner cannot be lost by mere nonuse, nor because the easement is not necessary for access to the dominant tenement.* [Citation.]"

However, when the current defendants' parcel was purchased, the 1977 map was no longer accurate as to the configuration of their parcel or the location of the easement across their parcel. The 1979 map, referenced in their deed, deleted the original easement, and established a road easement at the current location across Dragon Point Road. The 1979 map contains the planning director's certificate certifying that the map conforms to the requirements of former section 66499.20¾ of the Map Act.

---

[7] Plaintiffs are in effect third party beneficiaries of the actions taken by defendants' predecessors in interest.

Former section 66499.20¾ (now § 66499.20½) is a procedure for "undoing" a previously recorded map. (*Negron v. Dundee* (1990) 221 Cal.App.3d 1502, 1504, 1508 [271 Cal.Rptr. 381].) The section is intended for the abandonment of a previously recorded subdivision map. (*Id.* at p. 1506.) Former section 66499.20¾ provided that "[a]ny streets or easements to be left in effect after the resubdivision shall be adequately delineated on the [1979] map." Implied in this provision is the corellary, i.e., that any adequately delineated street or easement on the 1979 map is to be left in effect after the resubdivision. Because there cannot be more than one final map for a subdivision, the 1979 map is an amendment of the original 1977 map.

Thus, defendants were on notice that they were buying a parcel in the Latrobe Hills subdivision, subject to the Latrobe Hills CC&R's. They were further on notice that every parcel in the subdivision was entitled to use the road easements on the 1977 parcel map, and that the 1977 parcel map was amended in 1979 to move the road easement affecting their property to its current location.

When Bartleson and PMI amended the parcel map with respect to parcels 14 and 15, the effect was to amend the parcel map for the subdivision. When PMI sold parcels 28 and 29 to the original subdivision purchasers, it should have included both the original subdivision map, which described the boundaries of the parcel being sold, and the amended map, which described the appurtenant road easement.

■ We conclude the 1979 amendment was incorporated into the deeds of the subdivision purchasers whose deeds referenced the 1977 subdivision map, but who purchased their properties after the 1979 amendment to the map. We therefore hold that the sale of property with reference to a subdivision map incorporates any prior properly recorded amendment of the subdivision map.

Happe's predecessor in interest was expressly granted an easement as located on the original subdivision map before it was amended. However, Happe does not claim an interest in the portion of the original easement at issue in this appeal, and we will not decide an issue not tendered.[8]

---

[8] Defendants' motion for monetary sanctions for a frivolous appeal is denied.

## DISPOSITION

The judgment on the cross-complaint is reversed.[9] The trial court is directed to enter judgment quieting title in the easement shown on the 1979 parcel map in favor of plaintiffs. Appellants shall recover their costs on appeal.

Sims, J., and Robie, J., concurred.

---

[9] The trial court entered judgment on the complaint for plaintiffs. (See fn. 4, *ante*.) However, neither plaintiffs nor defendants challenge that judgment on appeal. Thus the only judgment of consequence is the judgment on the cross-appeal.