Filed 9/20/21  Rock v. Rollinghills Property Owners Assn. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BARBARA ROCK et al., <br><br> Plaintiffs, Cross-defendants and Appellants, <br><br> v. <br><br> ROLLINGHILLS PROPERTY OWNERS ASSOCIATION et al., <br><br> Defendants, Cross-complainants and Respondents. | A160163 <br><br> (Mendocino County Super. Ct. No. SCUK-CVG-2017-68592) |

In 2002, Barbara and James Rock bought roughly 150 acres of timberland in Point Arena near the Mendocino County coast (Rock property), intending to eventually build a retirement home.  They had been informed the property was landlocked, but they hoped to later negotiate an access easement from neighboring landowners.  As it turned out, they lost their gamble.  Fifteen years later, after repeated approaches to the county; the Rollinghills Property Owners Association (RPOA), the property owners' association for the adjacent Rollinghills subdivision; the subdivision's homeowners and other neighboring landowners proved fruitless, the Rocks sued the RPOA, its individual homeowners, and the original subdivider who owns a property abutting the subdivision to the south (collectively, defendants).

1

The complaint alleged the Rocks had a right to use the subdivision's private roads to access their parcel pursuant to theories of express easement, easement by estoppel, easement by necessity or implication, prescriptive easement, and equitable easement. Defendants cross-complained to quiet title and for a judicial declaration that the Rocks had no such right. After a four-day bench trial the court found the Rocks failed to establish an easement under any theory and entered judgment for defendants as to the entire action. Its findings and judgment are supported by substantial evidence and the relevant law, so we affirm.

## BACKGROUND[1]

### I. The Properties

We begin by describing the three relevant properties: the Rock property, the Rollinghills subdivision, and the "Hay property" to its south, across which the subdivision's property owners have a private easement to access the nearest public road.[2]

The Rock property is an undeveloped 146-acre parcel zoned for timber production, which their predecessor in interest accessed by a logging road across an adjacent parcel to the property's southeast. To the Rock property's south, the Rollinghills subdivision comprises approximately 530 acres subdivided into 25 roughly 20-acre lots. A segment of the subdivision's

[1] Our discussion of the relevant evidence is in conformance with the standard of review for substantial evidence.

[2] The Rocks improperly included annotated versions of the Rollinghills subdivision map in their opening brief, modified to depict the parties' respective "interpretation[s]." Appellate courts may not consider matters outside of the record, so we have disregarded them. (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1220, fn. 4; *Hodge v. Kirkpatrick Development, Inc.* (2005) 130 Cal.App.4th 540, 546, fn. 1; Cal. Rules of Court, rule 8.204(d).)

2

northern boundary abuts the southern boundary of the Rock property, while portions of its southern boundary abut land owned by William Hay (Hay property), who developed the subdivision in the early 1970's. Among these three properties, only the Hay property has direct access to a public road.

## II.    Hay Creates the Rollinghills Subdivision

In 1974 Hay's partnership, H Bar H, subdivided the land now known as the Rollinghills subdivision. Hathaway Crossing, the subdivision's main road, runs roughly three miles across its center before it dead-ends at an interior cul-de-sac. On the western side of the subdivision it intersects Pine Reef Road, which exits the subdivision to the south, crosses the Hay property and finally intersects with Eureka Hill Road (also called Riverside Drive), a public road. In the 1970's Hay's predecessor in interest granted H Bar H an easement along Pine Reef Road for the exclusive use of the subdivision's property owners to access Eureka Hill Road.[3] Pine Reef Road provides the subdivision's sole connection to public roadways.

The county approved and recorded the final subdivision map for the Rollinghills development in 1974. The map identifies all of the roads within the subdivision as private roads. The 60-foot wide private road easement identified as " 'Rollinghills Way' " or " 'Road A' " is what is now known as Hathaway Crossing. Roads "D" and "E" are shown as two relatively short 60-foot wide road easements adjoining and perpendicular to Hathaway Crossing. Road D leads north and terminates at the subdivision's boundary with the Rock property. Road E leads east and also terminates at the subdivision's boundary. Neither road was ever built. The subdivision map also references various easements affecting the subdivision, including public utilities easements and the private access easement across the Hay property

---

[3] Hay acquired the property, subject to the easement, in the 1980's.

to Eureka Hill Road.  It does not depict or refer to the Rock property or describe any easement as benefitting it.

After the final subdivision map was recorded, H Bar H formed the RPOA to manage and maintain the subdivision's roads.  All 25 parcels were sold within two or three years.

### III.    Many Years Later, the Rocks Purchase Land in Point Arena

In 2001 the Rocks, residents of Orange County, were looking for a retirement property in Northern California.  They considered several properties, but "fell in love with" the unimproved 146-acre Point Arena parcel adjacent to the Rollinghills subdivision's northern boundary.  Their realtor, Ray Eckert, informed them that the property was landlocked and that there were access issues with the neighbors, but also that seller Eel River Sawmills (Eel River) was willing to give them " 'a good deal.' "  The Rocks offered Eel River $30,000 more than the $152,000 listing price if it could provide an agreement with the neighbors for access to the parcel, but, if any such attempt was made, it was unsuccessful.

Before going through with the purchase, the Rocks received a preliminary title report that expressly excluded from coverage "[t]he lack of a legal right of access to and from a public street or highway."  The Rocks acknowledged that they "READ, UNDERSTOOD & ACCEPTED" this report.  They also received and executed an addendum to their purchase-sale contract that stated, "By signing this contract, Buyer is aware there is no deeded right away [*sic*] to the property.  Buyer is aware to obtain the right away [*sic*] is the responsibility of the buyer [¶] . . . . [¶] Buyer understands subject property is title/insurable with exclusion of right of way."  (Block

4

capitalization omitted.)  Eckert nonetheless told the Rocks he believed the property had access and that he would research the issue.[4]

On January 22, 2002, Eckert faxed the Rocks a copy of what is apparently an exhibit to a title document for one of the subdivision's lots, with his handwritten notation that "This is the easement" and an arrow pointing to the printed description of a "PARCEL TWO" as a "60' wide private road easement and public utility easement as delineated upon" the subdivision map.  Eckert had also noted on the document that "When easement is created by Parcel Map & delineated—always goes back to Parcel Map" and "The Law."  Barbara Rock testified that she and her husband believed this meant "we could move forward with the purchase of the property because we did have our legal access."  One week later, without conducting any further research into the access question, they purchased the property for $152,000.

In April 2002 the Rocks wrote to the RPOA board and president requesting membership in the association and expressing their desire to obtain an access easement across the subdivision's roads.  They wrote, "We had been looking for a retirement property on the southern Mendocino-northern Sonoma coast when we found out about the [Eel River] property.  Our realtor informed us that it was landlocked, but [Eel River] was willing to give us a good deal if we could close quickly because the sawmill was going out of business.  We took a chance and bought the parcel with the hope that we would be able to negotiate the easements we needed."  The Rocks expressed their willingness to agree to various use restrictions "if [the RPOA]

---

[4] Eckert was also Eel River's agent.  In early January 2002, Barbara Rock asked him, "How do you feel about your role as dual agent in this situation?  It seems like it could get complicated."  Eckert died before the trial, and the Rocks never filed a claim against the brokerage.

granted us our easement." Barbara Rock conceded at trial that she understood "landlocked" to mean "[w]ithout legal access" when she wrote this letter. The RPOA considered and denied the Rocks' request.

The Rocks made further unsuccessful efforts to negotiate with the RPOA for an easement over the next two years, coupled with threats of litigation if they were not allowed to access their property through the subdivision. They also contacted other adjacent landowners, writing that "[a]t this time we have no legal access so we are contacting all adjoining landowners. Would you be willing to discuss access through your parcel?" Those efforts apparently came to naught. In June 2006 Barbara Rock informed a Regional Water Quality Control Board inspector that their property lacked legal access through the Rollinghills development and that "[a] legal easement was not established during the purchase of the property and therefore the property is currently isolated."

Nevertheless, in 2011 the Rocks applied to the county for a permit to construct a road from Hathaway Crossing to their property at the location marked "Road D" on the subdivision map. The RPOA protested, and the Rocks withdrew the application after the county informed them they "likely do not have a deeded easement for access" because their property was not part of the subdivision. In 2013 the Rocks looked into buying a property that would provide access to the Rock property, but that effort also came to naught, as did further efforts in 2014 to negotiate for an easement and further threats of litigation.

## IV. The Lawsuit

In January 2017 the Rocks sued defendants. The complaint alleged causes of action for "quiet title to express easement," easement by prescription, easement by "necessity/implication," easement by estoppel,

6

equitable easement, and declaratory and injunctive relief. (Block capitalization omitted.) Defendants answered and cross-complained for a declaration that the Rocks had no easement or other right of access across the subdivision or its roads and to quiet title against all such claims.

Following a four-day bench trial, the court rejected all of the Rocks' causes of action. It explained: "Plaintiffs purchased their property knowing it was landlocked in 2002. After failed attempts to negotiate access with the adjoining property owners, and a brazen attempt to construct Road D on their own with no legitimate access easement, they filed suit in 2017. The evidence presented fails to establish the existence of a legitimate right to access the property adjacent to the subdivision."

The court rejected the Rocks' primary claim that the subdivision map created an express easement in their favor over Road D and the subdivision's other private roads, finding that neither the evidence nor the provisions of the Mendocino County Code concerning subdivisions and lot access supported it. The court observed that the Rocks' interpretation of the County Code would effect an unconstitutional taking by requiring developers to grant access easements to private adjoining landowners without compensation.

As to the Rocks' implied easement theory, the court concluded the evidence showed neither that the parties intended to create an easement nor that the Rock property became landlocked as a result of a conveyance that removed the two properties from common ownership.[5] Next, the court found the Rocks were not entitled to an equitable easement because they were aware the property lacked legal access when they bought it. Finally, it

---

[5] The Rocks' appellate briefs do not address this cause of action, so we deem it abandoned. (See *Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 948 [appellate review is limited to causes of action briefed on appeal].)

7

concluded, their claim for a prescriptive easement was defeated by evidence that right-to-passage signage was posted pursuant to Civil Code section 1008 during the entire period of their ownership; that they had visited the property only a handful of times; and that there was no evidence their predecessor in interest had used Road D for access.

Judgment was entered in favor of defendants on both the complaint and cross-complaint. This timely appeal followed.

## DISCUSSION

### I. Express Easement

As at trial, the Rocks assert the recordation of the final subdivision map in 1974 created an express easement over the subdivision's private roads in favor of their property. They base this conclusion on three arguments. First, they contend the 1974 subdivision map establishes the alleged easement as a matter of law without regard to extrinsic evidence. Second, they assert their interpretation of the map is supported by extrinsic (and they claim undisputed) evidence. Third, they contend provisions of the Subdivision Map Act (Gov. Code, § 66410 et seq.) and Mendocino County Code required H Bar H to provide access to their parcel. We reject these arguments.

### A. The Map

We start with the Rocks' argument that the recorded subdivision map independently establishes an express easement in their favor.[6] The parties

_____

[6] Defendants moved at trial to exclude extrinsic evidence offered to construe the subdivision map, arguing the Government Code precluded evidence offered to contradict the final approved map and, alternatively, on hearsay grounds. At the outset of the trial the court indicated it would receive such evidence and determine its admissibility and weight. During trial defendants objected to the admission of several documents as improper

8

agree that our review on this point is de novo. (Civ. Code, § 1066 [grants of real property interests are generally subject to rules governing contract construction]; *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238; *WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1710.) They are correct, up to a point. "The trial court's resolution of an ambiguity [in a written instrument] is . . . a question of law if no parol evidence is admitted or if the parol evidence is not in conflict." (*WYDA Associates v. Merner,* at p. 1710.) However, to the extent the trial court admitted and relied on extrinsic evidence to resolve any such ambiguity, we review its findings for substantial evidence. (*Ibid.*)

At its core, the Rocks' position is based on the fact that Road D, as it is designated on the subdivision map, terminates at the border between their property and the Rollinghills property.[7] They contend: "[T]he map expresses an intent to create an easement to the property to the north because it *depicts Road D as ending at the subdivision's northern boundary.*" Relying primarily on *Danielson v. Sykes* (1910) 157 Cal. 686 (*Danielson*) and *Bello v. ABA Energy Corp.* (2004) 121 Cal.App.4th 301 (*Bello*), they assert this configuration independently created an access across the subdivision's private roads for the benefit of their property as a matter of law. We disagree.

---

parol evidence and hearsay, but the court found they were helpful and admitted them. On appeal they continue to suggest the extrinsic evidence was improper or at least unnecessary, but they do not challenge the court's evidentiary rulings.

[7] While the Rocks describe this theory as one of an express easement, defendants address it as suggesting an implied easement based on the subdivision map. The difference in approach is ultimately inconsequential, as the trial court correctly rejected the Rocks' position that the map established an access easement for the benefit of their property.

The subdivision map does not indicate an intent to grant an easement over Road D *for the benefit of the Rock property*. The map makes no mention of such an easement even though the map expressly references other easements affecting the subdivision, including public utility easements and an easement across the Hay property for the subdivision's homeowners. Indeed, the map does not even depict or reference the Rock property. The mere fact that the map depicts a private road ending at the boundary of the Rock property, by itself, is not enough to establish an express easement for the benefit of that property.

While the Rocks correctly observe that lots *within a subdivision* and sold with reference to a recorded subdivision map incorporate any express easements shown on the map (*Christian v. Flora* (2008) 164 Cal.App.4th 539, 551, 554–555; Gov. Code, § 66499.57),[8] their attempt to extend this principle to properties beyond the subdivision's borders is not persuasive.

*Danielson* illustrates this point. Hattie Danielson bought two adjacent lots within a subdivision. (*Danielson, supra,* 157 Cal. at pp. 689, 691.) Richard Sykes acquired a lot across the street from Danielson's property, along with the ground included in an adjacent alley that opened onto the street directly opposite Danielson's parcel. There he erected a fence across the alley's entrance to the street, resulting in Danielson's action against him. (*Ibid.*)

---

[8] Under Government Code section 66499.57, "Whenever the city council or board of supervisors adopts a map prepared under this division as the official map of the subdivision, town, city or county, it shall be lawful and sufficient to describe the lots or blocks in any deeds, conveyances, contracts, or obligations affecting any of the lots or blocks as designated on the official map, a reference sufficient for the identification of the map being coupled with the description."

In this context, the Supreme Court applied the "thoroughly established proposition" that "when one lays out a tract of land *into lots and streets* and *sells the lots* by reference to a map which exhibits the lots and streets as they lie with relation to each other, the purchasers *of such lots* have a private easement in the streets opposite their respective lots, for ingress and egress and for any use proper to a private way. . . ." (*Danielson, supra,* 157 Cal. at p. 689, italics added.)  "[S]uch map becomes a part of the deed.  If the map exhibits streets and alleys it necessarily implies or expresses a design that such passageway shall be used in connection with the lots and for the convenience of the owners in going from each lot to any and all the other lots in the tract so laid off. . . ." (*Id.* at p. 690.)  "A subsequent deed for one of the lots, referring to the map for the description, carries such appurtenance as incident to the lot." (*Ibid.*)

Applying this principle to a subdivision's minor streets as well as its thoroughfares, the high court held that Danielson was entitled to access the alley depicted on the subdivision map.  (*Danielson, supra,* 157 Cal. at pp. 690–692.)  By the same principle, anyone who purchases a lot in the Rollinghills subdivision "by reference to" the subdivision map has access to the private roads and easements depicted on it.  (*Id.* at p. 689.)  Nothing in *Danielson*, however, supports the Rocks' proposition that this entitlement applies also to those who, like them, never purchased property within the subdivision.

*Bello, supra*, 121 Cal.App.4th 301, is equally inapposite.  The Rocks rely on *Bello* for the proposition that, "when private property abuts an established street or road, a right-of-way is simply presumed without further inquiry." (*Id.* at p. 317.)  *Bello*, however, addressed the installation of

11

a pipeline in a *public* right-of-way. (*Id.* at p. 305.) The court expressly distinguished this situation from a *private* easement: "[u]nlike a private easement, the use rights of a public right-of-way are vested equally in each and every member of the public." (*Id.* at p. 308; accord, *Fitzgerald v. Smith* (1928) 94 Cal.App. 480, 484 [abutting landowner had right of access over *public* highway].) Here, neither Road D nor the other private roads designated on the subdivision map have ever been dedicated to the public. Thus, the map, by itself, does not establish an easement over Road D for the Rock property.

## B. Extrinsic Evidence

At least implicitly relying on evidence beyond the map itself, the Rocks argue that, since the residents of Rollinghills have neither any legal right to access the Rock property nor any "past, present, or future need" to do so, "[t]he only reasonable use [of Road D] that could have been contemplated" when the subdivision map was filed was to provide their own property with access over the subdivision to Eureka Hill Road.[9] In their view, Road D could simply serve no other purpose.

Assuming for the sake of argument that the properties' respective topographies and their orientation to each other and Road D suggest some ambiguity on this point, our task is to "interpret the grant of easement in accordance with the rules of construction codified by statute [citation]. In such case, we may look to surrounding circumstances and the relationship of

---

[9] At the same time, the Rocks assert it is "completely unknown" whether it is even possible, given the topography of their land, to construct a passable road onto it from the point where Road D abuts their southern boundary. (Italics and underscoring omitted.) They do not explain how this assertion can be reconciled with their claim that Road D was intended to provide their land access to and beyond the subdivision's roadways.

the parties and the properties involved [citations]" to give effect to the mutual intent of the parties. (*Christian v. Flora, supra*, 164 Cal.App.4th at p. 550; *City of Manhattan Beach v. Superior Court, supra*, 13 Cal.4th at p. 238.) When extrinsic evidence is introduced to interpret the instrument, "the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence." (*WYDA Associates v. Merner, supra,* 42 Cal.App.4th at p. 1710.)

The trial court considered the evidence and rejected the Rocks' view that Road D was necessarily created for the benefit of their property. Rather, it found that "Road[s] D and E were identified as <u>future</u> access routes to the north and east for the benefit of the subdivision." That conclusion is supported by substantial evidence. As the court observed, "Joseph J. Scherf a licensed land surveyor who worked on the subdivision project confirmed this in a 1973 letter report in which he wrote that, *'Easements for future extension of the road system have been established.'*" Scherf's report also noted the subdivision would increase traffic on the county road by "at least '25 families,'" a figure that did not appear to include traffic from what is now the Rock property. (Italics omitted.) Finally, the court noted, there was no indication of any agreement between Hay and adjoining landowners for access easements.

Other evidence confirms the court's conclusion that Road D was not intended as an easement for the benefit of the Rock property. Hay testified that it was drawn in at the county's request and was initially intended only for fire access. At a 1973 meeting on the property with county and forestry department officials, he expressed his concern that the proposed Road D would "go nowhere," and, consequently, his reluctance to spend money building it. County personnel ended up agreeing that Road D need not be

13

constructed, but they wanted to leave the easement on the map to provide the subdivision with access to a public road north of the Rock parcel "if the adjacent north property was ever developed." The county then required Hay to construct turnouts along Hathaway Crossing for forestry vehicles as a "trade-off" for dispensing with the requirement that he build Roads D and E. In the end, the county inspected the subdivision, determined that all required road improvements had been completed, and approved the final map.

The Rocks emphasize the testimony of former Mendocino County Department of Transportation Director Eugene Calvert that Road D was an express easement for the benefit of the Rock property. But the court explicitly rejected Calvert's view of the matter. As stated in its statement of decision, "the court gave little weight to [Calvert's] testimony. He did not testify as an expert, nor was he involved in the parcel subdivision which occurred in 1974. There was insufficient evidence to establish that Mr. Calvert or any other county official conclusively determined that Road D was an express easement for the benefit of property adjoining the subdivision." "In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations." (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.)

### C. Mendocino County Code and Subdivision Map Act

Alternatively, the Rocks contend the trial court erred in interpreting the subdivision map because the county's subdivision laws *required* that Hay provide access to their property. Title 17 of the Mendocino County Code addresses the division of land. Section 17-53, subdivision (C) (section 17-

14

53(C)) provides that "[a]ll streets shall, insofar as practicable be in alignment with existing adjacent streets by continuation of the centerlines thereof, or by adjustments by curves, and shall be in general conformity with plans made for the most advantageous development of the area in which the division of land lies. *Where a division of land adjoins acreage, provision shall be made for adequate street access thereto.*" (Italics added.) Relying on the italicized language, the Rocks argue their property is "acreage" that adjoins the Rollinghills subdivision (a "division of land"). Thus, section 17-53(C) required Hay to grant them legal access through the subdivision to the nearest public street.[10]

The court disagreed with the Rocks' construction of section 17-53(C), reasoning that their interpretation would lead to absurd results and finding it unsupported by the evidence. The court further concluded that construing section 17-53(C) to require the grant of an easement to a private adjoining landowner "would violate the Constitution as an unlawful taking without just compensation. The court recognizes that in the course of processing a subdivision plan, the government may reasonably require certain dedications that benefit the general welfare of the public. But taking property to benefit a private person without establishing a public purpose is not permitted. [Citation.] In this case, no public purpose was established. Plaintiffs

---

[10] We found nothing in the record indicating that access to the Rock property was not "adequate" when the Rollinghills subdivision was approved in the early 1970's. Indeed, the evidence suggests otherwise. Eel River's long-term predecessors in interest, Charles Halliday and his forbears, did not access the property through the subdivision. Instead, they primarily accessed the Rock property through a property to the west and north along Harris Ranch Road, while Eel River used a logging road from Eureka Hill Road across a Mr. Cunningham's property east of the subdivision. As neither party has addressed this issue on appeal or, apparently, in the trial court, we merely flag it as an open question.

15

themselves argue that Road D was designated solely for their benefit and no others."

Although the parties spend much of their briefs parsing various provisions of Title 17, we need not resolve these arguments. Assuming that section 17-53(C) is susceptible to the Rocks' ascribed meaning, the trial court properly rejected their construction because it would raise a serious question about the provision's constitutionality under the Takings Clause. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 509 [" 'If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable' "].)

Under the Fifth Amendment of the United States Constitution, " 'one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid.' " (*Hawaii Housing Authority v. Midkiff* (1984) 467 U.S. 229, 241.) Here, the trial court expressly found the Rocks failed to establish a public purpose for their claimed easement. Substantial evidence supports that finding. As the court noted, the county's inspection and approval of the subdivision despite Roads D and E not having been constructed indicated it did not consider either to be for the benefit of the adjoining property, much less the public. Nor was there sufficient evidence to show that any county official so determined. "Plaintiffs offered no testimony from any employees from the Planning Department or County Counsel. There was no testimony offered from any county official who was involved in the parcel subdivision in 1974.

16

There was evidence however, that the same Department of Transportation questioned the access issue in 2012 when Plaintiffs attempted to obtain a permit to build Road D. Specifically, the Department opined, 'The parcels to be served by the proposed driveway were not a part of the Parcel Subdivision which created the 60-foot wide easement and there[fore] likely do not have a deeded easement for access.' In 2012 the Department recognized that the 60-foot wide easement (Road D) was for the benefit of the subdivision." (Italics omitted.)

Although in their reply brief the Rocks identify fire prevention, brush clearance and "provid[ing] for an orderly street system" as public purposes, these suggestions do not withstand review for substantial evidence. Indeed, the evidence indicated that the county determined that Road D was not needed for fire access. (See *ante*, at p. 14.) Moreover, the Rocks' suggestions are difficult to square with their positions in the opening brief that "[t]here is no chance that the access provided to [them] through Road 'D' would be used to serve any other residence" and "there is no mention anywhere in the subdivision file that any easement within the subdivision was for fire access."[11]

In close but somewhat vague relation to their position on section 17-53(C), the Rocks contend the trial court misinterpreted the Subdivision Map Act to rule that, as a matter of law, easements shown on a subdivision map "can benefit only the subdivided parcels, not adjoining properties outside of the planned development." This "erroneous legal construction," they argue,

---

[11] We also query whether, assuming Road D was intended for fire prevention or suppression, it would provide them a private right of access for residential use. "The extent of a servitude is determined by the terms of the grant . . . ." (Civ. Code, §806; *Friends of Hastain Trail v. Coldwater Development LLC* (2016) 1 Cal.App.5th 1013, 1030.)

"operated to bar any relief based on the recorded map." They misrepresent the ruling: the court expressly acknowledged that "in the course of processing a subdivision plan, the government may reasonably require certain dedications *that benefit the general welfare of the public*." (Italics added.) It also found, however, that the county did not require the subdivider to dedicate Road D to the public welfare. *City of Buena Park v. Boyar* (1960) 186 Cal.App.2d 61, 66–67, which held a subdivider was reasonably required to install drainage improvements that benefitted areas beyond the subdivision, is thus inapposite.

Next, the Rocks argue the network of private roads shown on the Rollinghills subdivision map "[b]y definition" must provide access across the subdivision to their parcel, because Mendocino County Code section 17-54 prohibits the approval of private roads within subdivisions unless they "will not be a substantial detriment to the adjoining properties . . . ." The Rocks claim the Rollinghills subdivision imposed a "substantial detriment" on their parcel by interposing 25 lots between it and Eureka Hill Road. (Boldface omitted.) Therefore, as we understand the argument, the county must have intended that Road D would "ensure[] that those new properties would not create further access problems" for the Rock parcel.

This argument, too, is unpersuasive. There is no indication in the record that the Rock parcel historically had either a legal right to traverse the Rollinghills land or a pattern of doing so. It is therefore difficult to fathom what "detriment" the approval and construction of the subdivision in the 1970's could have inflicted on it. We conclude, in sum, that the trial court

18

properly found the subdivision map did not create an express easement over the Rollinghills subdivision for the benefit of the Rock property.[12]

## II. Estoppel

Taking a different approach, the Rocks argue that defendants are estopped from denying them an easement across the subdivision because Hay "accepted the benefits of the subdivision, a requirement of which included a [sic] providing street access to and from the acreage that is presently the Rock Parcel." (See *County of Imperial v. McDougal* (1977) 19 Cal.3d 505, 510–511 [acceptance of benefits afforded by permit may bar landowner from challenging condition imposed as condition of its issuance].) Little need be said here, as the argument does not withstand the evidence (not addressed by the Rocks) that the county *agreed* that H Bar H was not required to build Road D and that its purpose was to provide the *subdivision* with access to Harris Ranch Road in the north if the Rock property were developed in the future. As an appellate court, we may not reweigh that evidence. (*Estate of Beard* (1999) 71 Cal.App.4th 753, 778–779.)

## III. Prescriptive Easement

The Rocks contend they acquired a prescriptive easement to access their property over the subdivision's roads. This contention lacks merit.

"The party claiming [a prescriptive] easement must show use of the property which has been open, notorious, continuous and adverse for an uninterrupted period of five years." (*Warsaw v. Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 570.) Moreover, under Civil Code section 1008 (section 1008) "[n]o use by any person or persons, no matter how long

---

[12] We therefore need not address the Rocks' additional claim that their alleged easement extends past the subdivision's border over the Hay property to the intersection of Pine Reef Road and Eureka Hill Road.

continued, of any land, shall ever ripen into an easement by prescription, if the owner of such property posts at each entrance to the property or at intervals of not more than 200 feet along the boundary a sign reading substantially as follows: 'Right to pass by permission, and subject to control, of owner: Section 1008, Civil Code.' "

Although the Rocks attempt to cast this issue as one of law subject to independent review, they argue that the evidence (1) was insufficient to prove the RPOA posted signage in compliance with section 1008; and (2) compelled a finding that they used the alleged easement in an open, notorious, adverse and continuous manner. Our review is thus for substantial evidence. (*Ante*, at p. 14 [standard for substantial evidence review].)

The trial court found the RPOA prevented the creation of a prescriptive easement by posting section 1008-compliant signage from 2002 onward. That finding is supported by the stipulated testimony of multiple Rollinghills homeowners that a "section 1008 'right to pass by permission only' sign has been in place on the side of Pine Reef [R]oad leading into the entrance to the subdivision since at least 2002. . . . [¶] It faces southerly, and one cannot enter the subdivision without passing the sign." In addition, multiple witnesses testified that Pine Reef Road is the sole entrance to the subdivision, and a photograph and video of the posted sign were admitted into evidence. No more was required. While the Rocks complain that no sign was posted at *Road D,* there is no evidence Road D has ever functioned as an "entrance" to the Rollinghills property. (§ 1008.) Accordingly, section 1008 did not require that a sign be posted there.

IV.   **Equitable Easement**

We turn finally to the trial court's determination that the Rocks are not entitled to an equitable easement.

"[I]n a proper case, the courts may exercise their equity powers to affirmatively fashion an interest in the owner's land which will protect [an] encroacher's use.' [Citation.] That interest is commonly referred to as an equitable easement. [Citations.]

"For a trial court to exercise its discretion to . . . grant an equitable easement, 'three factors must be present. First, the defendant must be innocent. That is, his or her encroachment must not be willful or negligent. The court should consider the parties' conduct to determine who is responsible for the dispute. Second, unless the rights of the public would be harmed, the court should grant the injunction if the plaintiff "will suffer irreparable injury . . . regardless of the injury to defendant." Third, the hardship to the defendant from granting the injunction "must be greatly disproportionate to the hardship caused plaintiff by the continuance of the encroachment and this fact must clearly appear in the evidence and must be proved by the defendant . . . ." ' [Citation.] 'Unless all three prerequisites are established, a court lacks the discretion to grant an equitable easement.' " (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 1003–1004.)

The overarching principle is that the trespasser is the wrongdoer. (*Nellie Gail Ranch Owners Assn. v. McMullin, supra,* 4 Cal.App.5th at p. 1004.) " '[T]herefore, "doubtful cases should be decided in favor of the [landowner]." ' [Citations.] Moreover, 'courts approach the issuance of equitable easements with "[a]n abundance of caution." ' [Citation.] When courts compare the hardships or conveniences, the scales 'begin tipped in favor of the property owner due to the owner's substantial interest in exclusive use of her property arising solely from her ownership of her land.' " (*Ibid.*) Our review is for abuse of discretion. (*Ibid.*)

Here, the trial court did not abuse its discretion in finding the Rocks failed to prove the threshold element of innocent use. As the court explained, "[t]he Plaintiffs did not purchase their property with a good faith belief that an access easement existed. The purchase price was at a reduced rate due to a lack of access. The purchase agreement and policy of title insurance clearly states there is no access. Plaintiffs purchased the property in spite of knowing they did not have access with the hope that they would eventually gain access through negotiations with the adjacent property owners. This is clear from the correspondence written by the Plaintiffs to the Rollinghills property owners after they purchased the property. Also, in 2006, in a meeting with representatives from the California Regional Water Quality Control Board [(RWQCB)], Plaintiffs acknowledged that the property had no legal easement for access through the Rollinghills Development. According to RWQCB none was established at the time of the purchase and therefore the property is isolated."

Clinging to their testimony as to their state of mind in 2002 and asserting justifiable reliance on the scribbled fax from their realtor, the Rocks assert the trial court gave "undue weight" to the evidence they knew the parcel was landlocked and "ignored" Eckert's contrary advisement. Again, we are not at liberty to reweigh the evidence. The evidence relied on by the court and described in our Background section, *ante,* at pages 2–7, amply supports its findings, which in turn compel our rejection of the Rocks' equitable easement theory. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 [under an abuse of discretion standard, "[t]he trial court's findings of fact are reviewed for substantial evidence . . . and its application of the law to the facts is reversible only if arbitrary and capricious"].)

The Rocks alternatively rely on *Taliaferro v. Taliaferro* (1956) 144 Cal.App.2d 109, 113, to argue the court should have granted them access across the subdivision under its general equitable power to " 'recognize new and expanding remedies to meet new situations.' " They did not raise this theory in the trial court, so it is forfeited. (*In re Stier* (2007) 152 Cal.App.4th 63, 74; *United States Golf Assn. v Arroyo Software Corp.* (1999) 69 Cal.App.4th 607, 623.) In any event, "there is no need to create such new remedies where the remedies at law are adequate." (*Taliaferro v. Taliaferro,* at p. 113.) The Rocks provide no reason to conclude the judicial power to grant an equitable easement "in a proper case" is less than adequate. (*Nellie Gail Ranch Owners Assn. v. McMullin, supra,* 4 Cal.App.5th at p. 1003.) Their complaint, rather, is that the court found this is not such a case. We find no reason to disturb that determination.

## V.    Sanctions

The RPOA asks for sanctions against the Rocks for prosecuting a frivolous appeal. We grant such requests only if an appeal was (1) filed and prosecuted for an improper motive, i.e., to harass the respondent or delay the effect of an adverse judgment; or (2) indisputably devoid of merit, i.e., "any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) In exercising our discretion we are mindful of our high court's admonition that the line between a frivolous appeal and one that is merely meritless is often vague, and that we must proceed carefully to avoid chilling the right to appeal. "Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal. An appeal that is simply without merit is not by definition frivolous and

23

should not incur sanctions." (*Ibid.*, italics omitted.) Accordingly, sanctions for frivolous appeals should not be used "in all but the clearest cases." (*Ibid.*)

Here, despite the overall weakness of the Rocks' arguments, we are not convinced of their subjective bad faith. While their frequent disregard of the applicable standards of review and incomplete or otherwise misleading representations of the record sail perilously close to the line between zealous advocacy and harassment, in the end we are not persuaded that they meet *Flaherty*'s stringent standards. Sanctions are therefore denied.

## DISPOSITION

The judgment is affirmed. The motion for sanctions is denied. Respondents are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

_____
Chou, J.*

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A160163

_____
\* Judge of the Superior Court of San Mateo County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.