Filed 6/15/23  The Salvation Army v. City of Bell CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE SALVATION ARMY et al., | B316271 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 19STCP00693) |
| v. | |
| CITY OF BELL, | |
| Defendant and Appellant; | |
| CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC et al., | |
| Real Parties in Interest and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joel L. Lofton, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Aleshire & Wynder, David J. Aleshire and June S. Ailin for Defendant and Appellant City of Bell.

Jeffer Mangels Butler & Mitchell, Kerry Shapiro and Matthew D. Hinks for Real Party in Interest and Appellant CEMEX Construction Materials Pacific, LLC.

Rutan & Tucker, John A. Ramirez and Peter J. Howell for Real Party in Interest and Appellant PI Bell, LLC.

Natural Resources Defense Council, David Pettit, Kimberly E. Leefatt, Jaclyn H. Prange, and Cecilia Segal for Plaintiffs and Respondents.

_____

In 2013, the City of Bell (City) sold four parcels of real property located in the City to PI Bell, LLC (PI Bell). As part of the sale transaction, the City and PI Bell executed an agreement to facilitate the parcels' development (Development Agreement or Agreement). The City also certified an Environmental Impact Report (EIR) in connection with the Agreement.

PI Bell leased one of the parcels to a third party, which in turn subleased that parcel to CEMEX Construction Materials Pacific, LLC (CEMEX).[1] In 2018, CEMEX submitted a proposal to the Design Review Board (DRB) created by the Agreement to develop a gravel transfer and storage facility on the parcel.[2]

The DRB determined that the CEMEX project substantially conformed to the Development Agreement, and approved CEMEX's application subject to certain conditions. The

_____

[1] We refer to CEMEX, PI Bell, and the City collectively as "appellants."

[2] As a shorthand, we refer to CEMEX's proposal for the parcel in question as the "CEMEX project," which is the designation utilized by the trial court during the proceedings below.

2

DRB also found that its approval fell within the ministerial exemption to the requirements of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). Additionally, the DRB determined that even if its approval were subject to CEQA, no additional environmental review would be required. Specifically, the DRB determined that the CEMEX project would not result in new significant environmental impacts or a substantial increase in impacts identified in the EIR.

The Salvation Army (Salvation Army); East Yard Communities for Environmental Justice (East Yard); Grow Good, Inc. (Grow Good); and Shelter Partnership (collectively, respondents) filed a petition for writ of mandate, challenging the DRB's substantial conformity determination, the DRB's invocation of the ministerial exemption, and the DRB's finding that no further environmental review was required. Appellants seek review of the trial court's decision granting respondents' petition.

We affirm the trial court's decision to set aside the DRB's substantial conformity determination, which is the relief the court granted on respondents' first cause of action for administrative mandamus. Notwithstanding appellants' argument to the contrary, the Development Agreement does not authorize CEMEX's use of a roofless gravel storage building on the parcel without further proceedings. The Agreement incorporates by reference zoning code provisions that require gravel sales and storage operations to be conducted in a completely enclosed building unless the City's Planning Commission and the City Council determine that such uses are customarily conducted in the open. Appellants identified no

3

evidence that the Planning Commission and the City Council made such a determination, and they conceded at oral argument that there was no such determination. Appellants also fail to demonstrate that CEMEX's current use of the property falls within other authorized uses in the Development Agreement, or that the Agreement authorized the DRB to cure the roofless gravel storage building's departure from the City's Municipal Code.

In their briefing, appellants do not contest respondents' assertion that we need not reach appellants' challenges to the trial court's disposition of the CEQA causes of action if we affirm the judgment on the first cause of action. We agree with respondents because we do not know what steps CEMEX will undertake to address our invalidation under the Development Agreement of CEMEX's current use of the parcel or what actions City officials would undertake in response to CEMEX's future actions. To address respondents' CEQA causes of action as to such a noncompliant and invalidated development project would be rendering an advisory opinion as to moot issues. For that reason, the current record does not allow us to conclude that failing to address the CEQA issues now would have a tangible impact on the parties' rights and obligations under the statute.

Similarly, we conclude our affirmance of the judgment on the first cause of action also moots the judgment on the CEQA causes of action. Accordingly, we reverse the judgment on the CEQA claims, and remand with directions to dismiss those portions of the action as moot. In doing so, we express no opinion on whether the trial court's resolution of the CEQA issues was erroneous.

4

## FACTUAL AND PROCEDURAL BACKGROUND[3]

We summarize only those facts pertinent to our disposition of this appeal.

**1.** ***The City's approval of the Bell Business Center project***

This case involves four parcels of land in the City, which the parties refer to as Parcels A, F, G, and H.  In 2013, the City sold the four parcels to PI Bell, entered into the Development Agreement with that entity, and issued an ordinance adopting the Agreement.  The Agreement identifies the development of the four parcels as the Bell Business Center project.  Also in 2013,

---

[3] We derive our Factual and Procedural Background in part from undisputed aspects of the trial court's ruling on respondents' writ petition, admissions made by the parties in their filings, and assertions respondents raise in their brief to which appellants do not respond in their reply.  (See *Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 349, fn. 2 [utilizing the summary of facts provided in the trial court's ruling]; Applicable Law, *post* [noting that the trial court's orders and judgments are presumed correct]; *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 (*Artal*) [" '[B]riefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party.' "]; *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 (*Rudick*) [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"]; *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 709–710, 757 [same].)

the City certified the final EIR for the Bell Business Center project.

The four parcels are located in the CM (Commercial Manufacturing) zone.  Notwithstanding that zoning designation, the Development Agreement's list of "Eligible Uses" authorizes not only "[a]ny use currently permitted in the . . . CM (Commercial Manufacturing) zoning district," but also, inter alia, "[a]ny use currently permitted in the M (Manufacturing) . . . zoning district"; "Warehousing"; "Distribution"; "Logistics"; "Loading and Unloading of Parcels and Freight"; "Truck terminal"; "Sorting, loading and unloading of Parcels and Freight"; "Parcel and freight forwarding"; "Retail order fulfillment (online or catalog services)"; "General office uses"; "Onsite railroad service and transfer facility"; "Outdoor advertising media"; and "Telecommunications facilities (including monopoles and towers)."  Section 4.3 of the Agreement provides in pertinent part:  "[T]his Agreement and its Exhibits . . . shall prevail over any other Existing Land Use Regulations."[4]

The Development Agreement also created the DRB, which is a "four member review board consisting of the Community Development Director, City Engineer, one member of the Planning Commission and one member of the City Council . . . ."  As we explain later in this opinion, future development of the parcels is conditioned on the DRB's determination that the proposal is "based on the design requirements" of certain provisions of the Agreement.  (See Discussion, part A.1, *post*.)

---

[4] As pertinent here, "Existing Land Use Regulations" are defined as "actions of the City" (e.g., ordinances) applicable to the four parcels that were "in effect on the date the City Council approve[d] th[e] Agreement."

## 2. *The development of Parcels F, G, and H, the initial proposal for the CEMEX project, and the prior litigation*

Following execution of the Development Agreement, Parcels F, G, and H were developed into distribution centers. PI Bell leased Parcel A to BNSF, which in turn subleased it to CEMEX.[5]

In 2016, CEMEX submitted its initial proposal to develop an aggregate material storage facility on Parcel A. Under the initial proposal for the CEMEX project, gravel would be brought to the facility by railroad service, stored for resale, and subsequently transported for delivery to the local marketplace by truck. At the time CEMEX submitted its initial proposal, Parcel A was being used to store tractor trailers.

It is undisputed that City officials approved the initial proposal for the CEMEX project without following the procedures required by the Development Agreement. Specifically, appellants admit "[t]he City's then Community Development Director had formed an ad-hoc committee to review CEMEX's application, rather than convening the [DRB]." CEMEX thereafter obtained building permits and began construction in October 2017.

In 2018, East Yard, a nonprofit corporation that is devoted to "protect[ing] th[e] community and nearby residents from the harmful air pollution generated by industrial and goods movement activities," filed suit challenging the initial approval of the CEMEX project. The lawsuit alleged that the initial version of the CEMEX project was not a permitted use on Parcel A under the Development Agreement and had environmental impacts

---

[5] BNSF is not a party to this appeal.

7

that were not studied in the 2013 EIR. The City, PI Bell, and CEMEX entered into a settlement agreement that provided for, among other things, DRB review of CEMEX's proposal, modifications to the CEMEX project designed to minimize air quality impacts of the project, and a promise to adhere to the transportation mitigation measures from the 2013 EIR.

East Yard entered into a stipulation to dismiss its suit. The stipulation allowed East Yard to pursue its challenge to the CEMEX project if East Yard was not satisfied with the outcome of the DRB's forthcoming review.

### 3. *The DRB's approval of the CEMEX project, the Notice of Exemption, and CEMEX's operation of the facility*

In late 2018, CEMEX submitted a revised application for the CEMEX project to the DRB. The DRB held a public hearing on January 31, 2019. Later that day, the DRB issued a resolution approving CEMEX's application. The DRB found "substantial conformity with the Development Agreement . . . and the EIR . . . ." At the end of the "Substantial Compliance" section of the resolution, the DRB stated, "To the extent any of the foregoing findings were overturned, in the alternative, any deviations by the [CEMEX p]roject are found to be minor within the meaning of Section 5D of Exhibit C" of the Development Agreement. (Boldface omitted.)

The DRB also imposed certain conditions of approval, and stated that "[p]ursuant to the Development Agreement . . . conditions may be added to assure that the Project's construction and operations are consistent with the Development Agreement and EIR and do not adversely impact surrounding properties." One of those conditions of approval required CEMEX to "maintain a complaint hotline on a 24/7 status[,] . . . post a

8

publicly visible sign with the 24/7 telephone number and contact person's name where complaints can be received[,] . . . [and] maintain a written log of all complaints and actions taken in connection with the complaints and . . . inform complainants of the actions taken."

In the "CEQA Conclusions" section of the resolution, the DRB found that "[d]esign or aesthetic review of a project is not a decision that is subject to CEQA." (Boldface & underscoring omitted from the first quotation.) The DRB further found that "CEMEX's use of Parcel A does not result in new significant environmental impacts, a substantial increase in impacts identified in the Development Agreement EIR, or require substantially different mitigation measures than those established for purposes of the Development Agreement."

On February 5, 2019, the City filed a Notice of Exemption for the DRB's approval of the revised application for the CEMEX project.[6] In the Notice of Exemption, the City claimed that the DRB's "decisions are exempt from CEQA" because they are "Ministerial." Specifically, the City claimed the DRB's "authority is limited" under the Development Agreement "to determining

---

[6] The Notice of Exemption identifies "Planning Commission, City of Bell" as the "Public Agency Approving Project." (Boldface omitted.) This is an error. The remainder of the Notice of Exemption indicates the document concerns the DRB's approval of the "CEMEX aggregate transfer/storage facility at the Bell Business Center." Appellants concede that this Notice of Exemption asserts that "*the Board's* approval of the CEMEX construction and design plans was exempt from CEQA . . . ." (Italics added.) (See *Artal*, *supra*, 111 Cal.App.4th at p. 275, fn. 2 [holding that an assertion in a brief may be construed as an admission against the party making it].)

that development . . . is based on the design requirements set forth in the Development Agreement, conditions of approval of the Development Agreement and the Environmental Impact Report . . . ." The City further remarked that the DRB "does not have the discretion to establish conditions that alleviate adverse environmental impacts."

Construction on the CEMEX project was completed in May 2019, and the facility is currently operational.

### 4. *Respondents' initiation of the instant proceedings, the trial court's ruling and judgment, and appellants' notices of appeal*

On March 7, 2019, respondents commenced the instant proceedings against appellants. Before proceeding further, we note that Salvation Army and Shelter Partnership are nonprofit corporations that operate on parcels located near Parcel A. Salvation Army offers interim shelter services and supportive services for homeless individuals. Shelter Partnership operates a warehouse that distributes donated surplus goods to agencies within Los Angeles County. Grow Good is a nonprofit corporation that manages a community garden on land leased from Salvation Army.

Respondents' operative first amended verified petition for writ of mandate alleges three causes of action: (1) a mandamus cause of action challenging the DRB's finding that the CEMEX project was in substantial conformity with the Development Agreement; (2) a cause of action alleging that CEQA required the preparation of a subsequent or supplemental EIR for the CEMEX project in part because the project "was not analyzed in the 2013 EIR"; and (3) a cause of action alleging that the "Notice of Exemption . . . is invalid because [DRB] review of the [CEMEX

10

p]roject was a discretionary decision and its approval . . . was subject to CEQA."

In their prayer for relief, respondents sought, among other things, "a writ of mandate . . . commanding [the City] to set aside the January 31, 2019 finding of the [DRB] . . . and requiring [the City] to set aside its approval of the [CEMEX p]roject"; "a writ of mandate . . . commanding [the City] to conduct a subsequent or supplemental CEQA analysis of the [CEMEX p]roject, and to set aside its approval of the [CEMEX p]roject until such analysis is final"; and "[f]or temporary, preliminary and permanent injunctive relief halting . . . the use of K Street by CEMEX for any commercial purposes . . . ."[7]

Upon hearing respondents' petition, the trial court issued a ruling granting the petition. Regarding respondents' first cause of action for writ of mandamus, the trial court concluded, "The [DRB]'s determination that the CEMEX project is in substantial conformance with the 2013 Development Agreement is not supported by substantial evidence."

Concerning respondents' CEQA causes of action, the trial court concluded "substantial evidence does not support a finding that the DRB's actions were ministerial" because "the DRB had the discretion[,] and indeed did implement, conditions in order to shape the project to respond to potential environmental concerns associated with the CEMEX Project." The court further concluded the DRB erred in determining that "the CEMEX Project does not require subsequent or supplemental CEQA review." The court reasoned that because the EIR for the Bell

---

[7] K Street is "a utility street adjacent to Salvation Army and Grow Good."

11

Business Center project "was prepared to analyze whether or not the proposed 'industrial/warehouse[s] and ancillary office space[s]' of [that project] would cause any potential environmental impacts," "the EIR could not, and did not, contemplate the potential environmental impacts of" CEMEX's "open-air gravel storage, sale, and distribution facility." The court also rejected appellants' argument that CEQA's 30-day statute of limitations precluded respondents from obtaining relief under that statute.

The trial court also found that respondents' "request that the Court prohibit CEMEX from operating on K Street" was not "ripe for review" because all parties "have stipulated that CEMEX does not use K Street to access the facility," and "all parties agree that CEMEX makes use of Rickenbacker Road to access the CEMEX facility."[8]

The trial court entered judgment for respondents in accordance with its ruling on their petition. As to respondents' first cause of action for mandamus relief, the court issued a writ requiring the City to set aside the DRB's finding that the CEMEX project was in substantial conformity with the applicable provisions of the Development Agreement. For the second and third causes of action under CEQA, the court issued a writ requiring the City to set aside the Notice of Exemption for the CEMEX project and "[t]ake such additional steps under CEQA as [the City] deems proper . . . ." Appellants timely appealed the judgment.

---

[8] The parties agree that Parcel A does not benefit from an easement permitting legal access via Rickenbacker Road. This undisputed fact has no bearing on our disposition of the instant appeal.

12

## APPLICABLE LAW

"In general, where [an] administrative agency's decision is 'quasi-adjudicative' in nature," that is, " ' "an . . . act involv[ing] the actual application of . . . a rule to a specific set of existing facts[,]" ' " " 'review . . . is by administrative mandamus' " under Code of Civil Procedure section 1094.5.[9] (See *Stanford Vina Ranch Irrigation Co. v. State of California* (2020) 50 Cal.App.5th 976, 995–996.) That statute authorizes a trial court to "set aside [an] order or decision" of the agency. (See Code Civ. Proc., § 1094.5, subd. (f).) "When the trial court reviews the decision of an administrative body pursuant to section 1094.5, the inquiry 'shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' [Citation.]" (*County of Fresno v. Fresno Deputy Sheriff's Assn.* (2020) 51 Cal.App.5th 282, 288 (*Fresno Deputy Sheriff's Assn.*), quoting § 1094.5, subd. (b).)

In administrative mandamus cases, "[t]he appellate court applies substantial evidence review" to the agency's decision. (*Fresno Deputy Sheriff's Assn.*, *supra*, 51 Cal.App.5th at p. 288.)

---

[9] Although respondents styled their first cause of action for mandamus relief as a claim arising under Code of Civil Procedure section 1085, they maintain in their brief that Code of Civil Procedure section 1094.5 governs this cause of action. By failing to contest this assertion in appellants' reply brief, appellants tacitly concede that respondents are correct on this point. (See *Rudick, supra*, 41 Cal.App.5th at pp. 89–90.)

13

Under that standard, the appellate court " ' "reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all inferences in support of them." '[10] [Citation.] 'If the administrative findings are supported by substantial evidence, the next question is one of law—whether those findings support the agency's legal conclusions or its ultimate determination.' [Citation.]" (*Fresno Deputy Sheriff's Assn.*, at p. 288.)

"Matters presenting pure questions of law . . . are subject to de novo review." (*Shewry v. Begil* (2005) 128 Cal.App.4th 639, 642.) Such matters include "[t]he interpretation of a regulation or a statute" (see *Family Health Centers of San Diego v. State Dept. of Health Care Services* (2021) 71 Cal.App.5th 88, 97 (*Family Health Centers of San Diego*)), and the construction of " ' "a contract or written document" ' " so long as " ' "the interpretation [does not] turn[ ] upon the credibility of extrinsic evidence" ' " (see *Fresno Deputy Sheriff's Assn.*, *supra*, 51 Cal.App.5th at p. 288).

---

**10** Code of Civil Procedure section 1094.5, subdivision (c) provides that, "in cases in which the [trial] court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (Code Civ. Proc., § 1094.5, subd. (c).) In such cases, an appellate court's "focus is on the *trial court's* findings and whether there is substantial evidence to support those findings [citation] . . . ." (See *Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 512–513 (*Shenouda*).) Neither side asserts this standard of review applies to the instant appeal.

14

CEQA has " 'established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations.' [Citation.] A public agency must 'conduct a preliminary review in order to determine whether CEQA applies to a proposed activity.' [Citation.] At this stage, the agency must determine whether any of CEQA's statutory exemptions apply. [Citation.] If the project is in an exempt category for which there is no exception, ' "no further environmental review is necessary." ' [Citations.] [¶] If the project is not exempt from CEQA, the next step is to conduct an initial study. [Citation.] . . . [¶] . . . If [the initial study reveals that a] negative declaration is [not] appropriate, the final step is to prepare an EIR." (See *Parker Shattuck Neighbors v. Berkeley City Council* (2013) 222 Cal.App.4th 768, 776–777.)

" 'An EIR is an "environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." [Citations.] . . . ' [Citation.] The EIR 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.] [¶] Among other topics, an EIR must discuss significant environmental effects and unavoidable significant environmental effects . . . . For significant adverse effects, the EIR must describe feasible measures to minimize significant adverse effects . . . ." (*Ocean Street Extension Neighborhood Assn. v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1003.)

"The CEQA Guidelines are regulations adopted to implement CEQA, codified at California Code of Regulations, title 14, chapter 3, sections 15000–15387." (*Endangered Habitats*

*League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 792, fn. 11.)  CEQA Guidelines section 15268, subdivision (a) states: "Ministerial projects are exempt from the requirements of CEQA. The determination of what is 'ministerial' can most appropriately be made by the particular public agency involved based upon its analysis of its own laws, and each public agency should make such determination either as a part of its implementing regulations or on a case-by-case basis."  (CEQA Guidelines, § 15268, subd. (a).)  Conversely, "[w]here a project involves an approval that contains elements of both a ministerial action and a discretionary action, the project will be deemed to be discretionary and will be subject to the requirements of CEQA." (*Id.*, subd. (d).)

Furthermore, CEQA Guidelines section 15162, subdivision (a) provides in pertinent part:  "When an EIR has been certified . . . for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:  [¶] . . . Substantial changes are proposed in the project which will require major revisions of the previous EIR . . . due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects . . . ."  (CEQA Guidelines, § 15162, subd. (a)(1).)  CEQA Guidelines section 15163, subdivision (a) states:  "The lead or responsible agency may choose to prepare a supplement to an EIR rather than a subsequent EIR if:  [¶] (1) Any of the conditions described in Section 15162 would require the preparation of a subsequent EIR, and [¶] (2) Only minor additions or changes would be necessary to make the previous EIR adequately apply to the

16

project in the changed situation." (CEQA Guidelines, § 15163, subd. (a).)

"When an agency concludes an activity is exempt [from CEQA] based on factual considerations, a court reviews for substantial evidence. If the agency's determination 'involves pure questions of law, we review those questions de novo.' [Citation.]" (See *Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 487, 495.) "We review [an agency's] conclusion that [a p]roject did not require any further environmental review" under the substantial evidence standard. (See *Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 195, 204.) In the CEQA context, substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (See CEQA Guidelines, § 15384, subd. (a).) "Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence," whereas "[s]ubstantial evidence [does] include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (See *id.*, subds. (a)–(b).)

Additionally, the trial court's rejection of appellants' CEQA statute of limitations defense is reviewed de novo because the parties do not dispute the facts pertaining to that issue. (*Ventura Foothill Neighbors v. County of Ventura* (2014) 232 Cal.App.4th 429, 434 [" 'Where [as here] the pertinent facts are undisputed, it is a question of law whether a case is barred by the statute of

17

limitations.  Accordingly, we apply the de novo standard of review [to this issue].' "].)

Although deference to the trial court's resolution of respondents' mandamus and CEQA claims is not required, the court's rulings are subject to the presumption of correctness applicable to all trial court judgments and orders.[11]  Accordingly, " 'all presumptions and intendments are in favor of supporting the judgment[,] . . . the appellant has the burden of showing reversible error, and in the absence of such showing, the judgment . . . will be affirmed.' [Citations.]" (See *Estate of Sapp* (2019) 36 Cal.App.5th 86, 104.)  Our review is thus " ' " limited to issues which have been adequately raised and supported in [the appellant's opening] brief' [citation,]" and "[i]ssues not raised in an appellant's brief are deemed waived or abandoned." ' [Citation.]"  (See *Golden Door Properties, LLC*, *supra*,

---

[11]  (See *Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 939 ["An appellate court's task in the review of a mandate proceeding is essentially identical to that of the trial court. [Citation.]  Accordingly, 'we review the agency's actions directly and are not bound by the trial court's conclusions.' "]; *Shenouda*, *supra*, 27 Cal.App.5th at pp. 502–503, 512 [recognizing, in an administrative mandamus case, that "[b]ecause judgments of the trial court are presumed to be correct, the appellant bears the burden to affirmatively demonstrate error, and must show that the error was prejudicial"]; *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554–555 (*Golden Door Properties, LLC*) [noting that " 'we [are] not . . . bound by, or . . . required to show any deference to, the trial court's conclusion' " on a CEQA claim, but acknowledging that "even in a CEQA case, ' "[t]he most fundamental rule of appellate review is that an appealed judgment or order is presumed to be correct" ' "].)

50 Cal.App.5th at pp. 554–555.) " '[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record[,]' " along with " ' "any supporting authority." ' " (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277; *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 492.)

Lastly, " '[i]f the *decision* of a lower court is correct on any theory of law applicable to the case, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the lower court reached its conclusion.' [Citation.]" (*Estate of Sapp*, *supra*, 36 Cal.App.5th at p. 104.)

## DISCUSSION

Appellants contend we should reverse the judgment in favor of respondents on the first cause of action for writ of mandamus because "[t]he DRB's finding that the [CEMEX project] substantially conforms to the Development Agreement is supported by substantial evidence." (Boldface omitted.)

Appellants further argue the trial court erred in granting relief on respondents' CEQA claims, to wit, the second and third causes of action. First, appellants assert both causes of action fail because "[t]he City was not required to conduct further environmental review" before the DRB could "approve[ ] the design" of the CEMEX project. (Boldface omitted from first quotation.) In support of that position, appellants argue: (1) the DRB's "design review does not implicate CEQA" because it was not "a 'discretionary' decision within the meaning" of the statute, and (2) even if CEQA applies, "the DRB's determination that the [CEMEX project] would not cause impacts not already addressed in the 2013 EIR is supported by substantial evidence."

19

Appellants further contend the second cause of action is barred by CEQA's statute of limitations because that claim is actually an untimely challenge to the adequacy of the EIR that the City certified in 2013.

For the reasons set forth below, we affirm the trial court's grant of administrative mandamus as to the first cause of action, which set aside the DRB's determination that the CEMEX project substantially conforms to the Agreement. Furthermore, we agree with respondents that our affirmance of the trial court's disposition of their first cause of action moots appellants' challenge to the remainder of the judgment. In particular, the Notice of Exemption has no legal significance because it pertains to the DRB's invalid approval of the CEMEX project. Furthermore, the record before us does not disclose what, if any, steps CEMEX would take to cure the project's nonconformance with the Development Agreement, and what actions City officials will undertake in response to CEMEX's efforts. Without this information, we have no basis to predict what impact, if any, the trial court's rulings on the second and third causes of action would have on the parties in the future. Further, because our affirmance on the first cause of action also moots the judgment on the two CEQA causes of action, we reverse the judgment on those two claims, and remand with directions to vacate those moot portions of the judgment.

## A. The Trial Court Did Not Err In Setting Aside the DRB's Substantial Conformance Determination

The trial court concluded that the DRB's "determination that the CEMEX project is in substantial conformance with the 2013 Development Agreement is not supported by substantial evidence." In accordance with that ruling, the court granted

respondents the following relief on their first cause of action: "[A] peremptory writ of mandate shall issue providing as follows: [¶] . . . [¶] City of Bell shall: [¶] A. Set aside the [DRB]'s finding that the construction and design plans for the CEMEX facility were in substantial conformity with the applicable provisions of the Development Agreement adopted by Bell in 2013; [¶] B. Commence such additional [DRB] processes as may be appropriate under the 2013 Development Agreement regarding the project approved in that Agreement; and [¶] C. File a return to the writ confirming that the above-described actions have been taken and/or that a notice of appeal has been filed."

Appellants argue the DRB properly found that the CEMEX project is "based on the design requirements of" the EIR and certain parts of the Development Agreement—"[t]he approved Scope of Development, which includes the Basic Design Concept, Development Standards and Permitted Uses; [¶] [and t]he Conditions of Approval." Appellants further contend "the DRB also properly determined that, even if the design of the [CEMEX project] deviated from the design requirements of the governing documents," the DRB "could . . . approve[ the CEMEX project] as a minor modification" to those requirements.

As we explain below, the DRB's substantial conformance determination was erroneous because the undisputed facts establish that CEMEX's gravel storage facility does not constitute an Eligible Use identified in the Development Standards and Permitted Land Uses of the Development Agreement. Further, appellants fail to show that the DRB could nonetheless render the CEMEX project an Eligible Use. Accordingly, appellants do not demonstrate the trial court erred in granting relief on respondents' first cause of action for administrative mandamus.

21

> 1. *The Development Agreement required the DRB to determine whether the CEMEX project is an Eligible Use*

We first note certain relevant provisions of the Development Agreement. Section 6.2.2 provides in pertinent part: "Before action is taken on any Future Development Approval,[12] . . . plans and drawings of such Project improvement, sign, building or alteration proposed as part of the Future Development Approval shall be submitted, in such form and detail as the Director [of Community Development] may prescribe, to the [DRB] for approval. The submittal shall include the following information to the extent applicable to the Future Development Approval being sought: [¶] (a) Site plans [¶] (b) Landscaping plans [¶] (c) Building elevations/renderings [¶] (d) Color and materials board."

Section 6.2.3 in turn provides: "In order to grant design review approval, the findings and determinations of the [DRB] shall be that the Project improvement, as set forth in the proposed Future Development Approval, is based on the design requirements included in the approved Scope of Development, Basic Design Concept, Conditions of Approval, and Environmental Impact Report." Furthermore, Section 6.2.4 states: "If the [DRB] is unable to make the findings and

_____

[12] "Future Development Approvals" are "Site-specific (meaning specifically applicable to the Site only and not generally applicable to some or all other properties within the City) plans, maps, permits, and entitlements to use of every kind and nature" "approved by the City after the date the City Council approve[d] th[e] Agreement . . . ." The term "Site" refers to Parcels A, F, G, and H.

22

determinations prerequisite to the granting of design approval pursuant to this Section [(i.e., Section 6.2)], the application shall be denied." Section 6.2.5 declares: "Approval of a design, and the finding that such design conforms to the provisions of this Agreement, is hereby declared to be an administrative function. The [DRB] has the authority and responsibility to perform this administrative function. The action thereon by the [DRB] shall be final and conclusive."

Exhibit C to the Development Agreement is titled "Scope of Development," which includes "Exhibit C1 [ ] Basic Design Concept," "Exhibit C2 [ ] Development Standards and Permitted Land Uses," and "Exhibit C3 [ ] Offsite Improvement Narrative." The Basic Design Concept is comprised of "Site Plans[,] [¶] . . . [a] Conceptual Landscape Plan[,] [¶] . . . Illustrative Drawings and Elevations[,] [¶] . . . [and] Building Materials." Exhibit C2 of the Development Agreement includes a section titled "Eligible Uses," which consists of "Permitted Uses," "Accessory Uses," "Conditional Uses," and "Prohibited Uses." (Some capitalization omitted from first quotation.) One "Permitted Use" listed therein is "[a]ny use currently permitted in the M (Manufacturing) or CM (Commercial Manufacturing) zoning districts." Section 1.32 of the Development Agreement in turn provides in relevant part: "The Site, and all Parcels thereof, shall be restricted in use to those uses permitted under the Scope of Development (Exhibit 'C2')." Furthermore, Exhibit D to the Development Agreement is titled "Conditions of Approval."[13]

---

[13] Although Section 1.60 defines "Scope of Development" as "the description of the Project and the manner in which it will be developed as set forth in Exhibit '*D*' " (italics added), this reference to Exhibit D appears to be a typographical error

23

The definitions section of the 198-page Development Agreement does not include an entry for "design requirements," which, as we noted above, is a term used to delineate the scope of the DRB's design review authority in Section 6.2.3. Furthermore, neither side claims that any provision of the Agreement supplies a definition of that term. In support of their contention that the CEMEX project is "consistent with the *design requirements* of the Scope of Development" (boldface omitted, italics added), appellants assert the DRB properly determined that the CEMEX project is an Eligible Use. Consequently, appellants have implicitly admitted that the "Eligible Uses" included in Exhibit C2 are "design requirements included in the approved Scope of Development" for the purposes of Section 6.2.3 of the Development Agreement. (See *Artal*, *supra*, 111 Cal.App.4th at p. 275, fn. 2; see also *Proctor v. Vishay Intertechnology, Inc.* (2013) 213 Cal.App.4th 1258, 1272–1273 (*Proctor*) [indicating that a party's legal theory may give rise to an implicit concession upon which a court may rely in deciding an appeal].)

Indeed, as we explain below, the Development Agreement's restrictions on use of the parcels have design implications for developments on Parcel A. In particular, the Eligible Uses listed in Exhibit C2 include "use[s] currently permitted in the M (Manufacturing) . . . zoning district," uses that the applicable zoning code requires to be conducted within a completely enclosed building. (See Discussion, part A.2.b, *post*.) Therefore, we agree with appellants' position that the Eligible Uses impose design

_____

because Exhibit D consists of the Conditions of Approval. Other provisions of the Development Agreement correctly identify Exhibit C as the Scope of Development.

24

requirements that the DRB must consider when conducting its review.

> ## 2. *The DRB erred in concluding that the CEMEX project is an Eligible Use*

Appellants maintain that "[t]he Development Agreement . . . permitted a series of 'industrial, manufacturing, and warehousing' uses as 'Eligible Uses,' including, as most relevant here, gravel sales and storage facilities and onsite railroad service and transfer facilities." Appellants seem to argue that although "gravel sales and storage facilities" are not identified explicitly in the Development Agreement, that activity constitutes the following Eligible Use, which appears under the subheading "Permitted Uses": "[a]ny use currently permitted in the M (Manufacturing) . . . zoning district."[14] In addition, appellants intimate that the roofless gravel storage facility on Parcel A falls within the "distribution"; "logistics"; "sorting, loading, and unloading of parcels and freight"; and "onsite railroad service and transfer facility" entries in the Agreement's Eligible Uses. (Capitalization omitted.) For the reasons discussed in this part, we reject appellants' claim that the CEMEX project satisfies these definitions of Eligible Uses.

We note as a preliminary matter that although the "Eligible Uses" list also allows "[a]ny use currently permitted in the . . . CM (Commercial Manufacturing) zoning district," appellants do not cite any provision from the Municipal Code

---

[14] Under the Agreement, a "Permitted Use" is a category of "Eligible Uses" that (1) is not an "Accessory Use" or a "Prohibited Use," and (2) does not require a conditional use permit. For instance, "Warehousing" and "Logistics" are Permitted Uses.

25

demonstrating that the CEMEX project would constitute a use "permitted in the . . . CM (Commercial Manufacturing) zoning district." Furthermore, in their briefing as to this issue, the only Municipal Code provision appellants cite is Municipal Code section 17.40.020.A.20, which concerns only M Manufacturing zoning districts. Accordingly, we do not address further any uses permitted in CM zoning districts. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" 'The absence of cogent legal argument or citation to authority allows this court to treat [a] contention as waived.' "].)

> ### a. *The 2013 version of the Municipal Code applies to this case, and appellants do not contend otherwise*

The version of the City's Municipal Code that was operative when the City approved the Development Agreement in 2013 governs whether the CEMEX project falls within the scope of the "[a]ny use currently permitted in the M (Manufacturing) . . . zoning district[ ]" entry in the Eligible Uses list.[15] This passage's focus on uses "*currently* permitted in the M (Manufacturing) . . . zoning district[ ]" (italics added) suggests the provision is governed by the zoning provisions in effect when the City adopted the Development Agreement. (See *People v. Loeun* (1997) 17 Cal.4th 1, 11 [" '[The legislative] use of a verb tense is significant in construing statutes.' "]; see also *Christian v. Flora* (2008) 164 Cal.App.4th 539, 551 (*Christian*) ["Contracts . . . are

---

[15] The Municipal Code provisions discussed in this opinion were in effect in 2013. We, sua sponte, take judicial notice of them. (Evid. Code, §§ 452, subd. (b), 459.)

26

writings to be construed in accordance with substantially the same canons of interpretation as statutes."].)

We further note that appellants' legal arguments proceed on this assumption as well. Appellants argue that the Development Agreement is "a statutory development agreement," which they claim functions as an " 'assurance that the project [will] be approved based on rules, regulations, and policies existing at the time the development agreement was approved, even if those rules, regulations, and policies changed over the course of the development project.' " (Quoting *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 443.) In addition, to support their argument that the CEMEX project constitutes an Eligible Use, appellants cite a document they filed during the trial court proceedings, which they had identified as the version of "Municipal Code Section 17.40.020 in effect in . . . 2013 when the Development Agreement was approved . . . ." Accordingly, appellants implicitly agree that the 2013 version of the Municipal Code governs our analysis. (See *Proctor*, *supra*, 213 Cal.App.4th at pp. 1272–1273 [deeming certain parties to have made implicit concessions by advancing a particular legal theory on appeal].)

> b.     *Appellants fail to demonstrate that CEMEX's uncovered gravel storage facility complies with the applicable Municipal Code provisions for the M zoning district*

Appellants contend that Municipal Code section 17.40.020.A.20 authorizes CEMEX to maintain a gravel sales and storage facility on Parcel A. That provision states in pertinent part: "**Permitted uses.** [¶] No person shall use, or permit the use of any property zoned M except as herein

27

provided: [¶] A. Principal Uses. Premises in the M zone may be used for the following principal uses: [¶] . . . [¶] 20. Sand, gravel, fill dirt, topsoil sales and storage, not including a quarry operation . . . ."

Notwithstanding the permissive language of Municipal Code section 17.40.020.A.20, another section of chapter 17.40 restricts the gravel sales and storage operations of premises in the M zone. Municipal Code section 17.40.030.A provides: "**Limitations on permitted uses.** [¶] Every use in any M zone shall comply with the following: [¶] A. All uses shall be conducted within a completely enclosed building except for those uses which are customarily conducted in the open, such as the sale of cars, boats and recreational vehicles, as determined by the planning commission pursuant to Section 17.04.090 of this code."

Municipal Code section 17.04.090 in turn provides: "**Clarification of ambiguity.** [¶] If an ambiguity shall be found with reference to these regulations, including but not limited to, the appropriate classification of a particular use, the commission shall consider the matter and shall, by resolution, recommend to the city council the clarification of such ambiguity. When such a commission resolution has been approved by the city council, the same shall be deemed to be in force and effect and shall govern the interpretation of the affected provisions of this title, to which the same relates, until such time as an appropriate amendment thereto has been duly adopted."

It is undisputed that the CEMEX project calls for the storage of gravel in a building that does not have a roof. Respondents claim that the unroofed storage building does not constitute an Eligible Use because the DRB "failed to put the

issue to the Planning Commission for deliberation."[16]  Appellants do not dispute respondents' assertion that the DRB did not ask the Planning Commission to consider whether the unroofed storage building satisfies the "customarily conducted in the open" exception to the "completely enclosed building" requirement and, at oral argument, appellants conceded the absence of any such Planning Commission deliberation.  Nor does it appear that the voluminous record in this matter contains the Planning Commission and City Council resolutions required by Municipal Code sections 17.40.030.A and 17.04.090, and we will not scour the record when appellants have failed to identify any such resolution in the record.  (See *Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1, 4, 14 (*Inyo Citizens for Better Planning*) [" 'We are not required to search the record to ascertain whether it contains support for [appellant's] contentions.' "].)

Appellants nonetheless maintain "the trial court correctly found" that the CEMEX project "falls neatly within" the

---

[16]  Appellants urge us to disregard this argument because respondents raised it in a footnote in their respondents' brief. We exercise our discretion to consider the argument.  We do so because respondents' placement of this argument in a footnote did not prejudice appellants, given that appellants detected respondents' argument and offered a response in their reply brief. (See *Doe v. Marysville Joint Unified School Dist.* (2023) 89 Cal.App.5th 910, 914, fn. 3 [recognizing that an appellate court has the discretion to excuse a party's failure to adhere to appellate briefing requirements, and exercising that discretion in part because the briefing deficiencies did not prevent the other side from "substantively respond[ing] to [the party's] arguments"].)

Development Agreement's "parameters" for Eligible Uses. The excerpt from the trial court's ruling appellants cite for this proposition cannot withstand the weight they place upon it.

On the page they cite, the court explained that appellants had "argue[d] that the [CEMEX p]roject, which contemplates an open-air gravel storage and distribution facility, does not constitute a 'substantial change' from the Development Agreement because the Agreement permits the operation of a facility which sells and stores gravel." (Italics omitted.) The court went on to state, "While CEMEX's use of the Parcel *might be* consistent with the Development Agreement, this does not mean that such 'Permitted Use' was contemplated by the subject EIR." (First italics omitted, second italics added.) This is hardly a finding that CEMEX's use of Parcel A is an Eligible Use.

Although the DRB determined that CEMEX's "gravel (aggregate) sales and storage facility . . . is a Permitted Use in the M (Manufacturing) zone," the DRB did not mention the limitations imposed by Municipal Code sections 17.40.030.A and 17.04.090.

Appellants maintain that the City's "interpretation of a local ordinance . . . 'is entitled to great weight unless it is clearly erroneous or unauthorized.'" (Quoting *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1015.) Appellants make this argument in support of a different proposition, that is, that the DRB's design review process is exempt from CEQA. Specifically, they argue we should defer to the City's "view that the Development Agreement's design review process does not provide the DRB with authority to impose environmental-related conditions . . . ." Appellants do not argue expressly that we should defer to *the DRB's* apparent construction of the City's

30

zoning ordinances. Regardless, as set forth above, the plain meaning of Municipal Code sections 17.40.030.A and 17.04.090 establishes that M zone uses that are not conducted within a completely enclosed building require Planning Commission and City Council approval. Therefore, any contrary interpretation of these provisions would be "clearly erroneous." (See *Friends of Davis*, at p. 1015; see also *Green v. State of California* (2007) 42 Cal.4th 254, 260 ["The statute's plain meaning controls the court's interpretation unless its words are ambiguous."]; *Zubarau v. City of Palmdale* (2011) 192 Cal.App.4th 289, 305 [" 'Statutory construction is a question of law for the courts and the rules of statutory construction applicable to statutes are also applicable to local ordinances.' "]; *Family Health Centers of San Diego*, *supra*, 71 Cal.App.5th at p. 97 ["While an administrative agency's interpretation of the laws it is charged with enforcing may be entitled to deference, the court is the ultimate arbiter of the interpretation of the law."].)

> c. *The other entries in the Eligible Uses list upon which appellants rely do not encompass the roofless gravel storage facility*

Appellants also suggest that regardless of whether the CEMEX project comports with the aforementioned zoning code restrictions on gravel sales and storage operations, the roofless gravel storage building is authorized by the following entries found within the "Permitted Uses" subset of the list of Eligible Uses: "distribution"; "logistics"; "loading and unloading of parcels and freight"; and "onsite railroad service and transfer facility." (Capitalization omitted.)

In particular, they claim the CEMEX project "is a state-of-the art *distribution facility*" that "differs from a warehousing

31

operation only in the type of product received at the facility for distribution to the ultimate consumer—*i.e.*, aggregates, which are used to produce concrete to construct roads, housing, and public infrastructure." (Italics added.) Appellants also refer to the CEMEX project as "[a]n aggregate distribution and rail transfer facility," and, in the course of addressing the Municipal Code restrictions on the M zone, they ask rhetorically, "[W]hat railroad service and transfer facility is found indoors?" Additionally, in their reply brief, appellants point out that Eligible Uses under the Development Agreement include "logistics" and "sorting, loading, and unloading of parcels and freight." (Capitalization omitted.) Appellants further claim that respondents' reliance on regulations governing the M zoning district is "baseless" because "Eligible Uses were established by the Development Agreement, and the standards of the Development Agreement govern."

Thus, in appellants' view, the roofless gravel storage building is simply a part of CEMEX's distribution; logistics; loading and unloading of parcels and freight; and railroad operations on Parcel A. Under their approach, appellants need not resort to the Municipal Code provisions governing the M zone to establish the validity of their gravel storage facility on Parcel A. Given that appellants' theory is not restricted by the provisions of the zoning code or by the particular goods listed in the Eligible Uses list (which does not include gravel), their interpretation would authorize the storage of *any* type of product on Parcel A. As explained below, this construction of the Agreement is unpersuasive.

" '[T]he *context* in which a [contract] term appears is critical. " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances

of the case . . . .' " [Citation.]' . . . [Citation.]"  (See *Mount Vernon Fire Ins. Co. v. Busby* (2013) 219 Cal.App.4th 876, 882 (*Mount Vernon Fire Ins. Co.*).).)

Here, the Eligible Uses appear in the Development Agreement for the Bell Business Center project, which is a development proposal for which the City had certified a final EIR.  (Factual & Procedural Background, part 1, *ante*.)  If the Agreement were construed in the manner appellants propose, then it would have been impractical for the City to conduct a meaningful environmental review of the Bell Business Center project.  To discharge its obligations under CEQA, the City would have had to assess the significant environmental effects of *every* kind of good that conceivably could be distributed, transported by rail, and stored on Parcel A.  (See Applicable Law, *ante* [summarizing the required contents of an EIR].)  CEQA also would have required the City to formulate mitigation measures for each such significant environmental impact it had identified.  (See *ibid.*)  This administrative burden undermines appellants' expansive interpretation of the Agreement.  (See *Mount Vernon Fire Ins. Co., supra*, 219 Cal.App.4th at p. 882 [indicating the parties' "reasonable expectations" govern a court's interpretation of a contract, italics omitted].)

Furthermore, the City explained in the EIR that—just as is the case in the M zoning district—the Municipal Code typically requires uses in the CM zone to be conducted within a completely enclosed building.  The City further stated that the Bell Business Center project was "consistent with the existing . . . zoning for the project site" in part because "[t]he intent of the proposed project is to construct sufficient building area to allow all uses to be conducted in an enclosed building."  The City thus concluded the

33

Bell Business Center project presented no "conflict with . . . [the] zoning ordinance" that needed to be addressed by "mitigation measures." (Boldface, capitalization, & underscoring omitted.) This analysis from the EIR indicates that the municipality regards the completely enclosed building requirement as a "land use . . . regulation adopted for the purpose of avoiding or mitigating an environmental effect."[17]

Because appellants' proffered interpretation of the Agreement would ignore and contradict other portions of the Agreement[18] and yield an absurd result, we find it unpersuasive. (See *West Pueblo Partners, LLC v. Stone Brewing Co., LLC* (2023) 90 Cal.App.5th 1179, 1185 ["[T]he court 'should avoid an interpretation [of a contract] . . . which would result in an absurdity . . . .' "].)

For the foregoing reasons, appellants have failed to demonstrate that the roofless gravel storage building constitutes an Eligible Use under the Agreement.

---

[17] (See 14 Cal. Code Regs., Div. 6, Ch. 3, App'x G, § XI, subd. (b) [excerpt from checklist included with the CEQA Guidelines to assist a public agency in determining whether it should analyze certain potentially significant environmental impacts].)

[18] The Agreement contains several provisions indicating that the EIR is incorporated by reference therein. For instance, Section 4.4 provides in relevant part: "[T]he Developer [(PI Bell)] shall have a vested right . . . to receive from the City all Future Development Approvals for the Site that are consistent with, and implement, *the EIR* and this Agreement . . . ." (Italics added.)

3. *Appellants fail to establish that the DRB's authority to approve minor modifications resuscitates the DRB's erroneous substantial conformance determination*

As we have noted in our Factual and Procedural Background, part 3, *ante*, the DRB made the following statement in its resolution: "To the extent any of the foregoing findings [provided in the resolution approving CEMEX's design review application] were overturned, in the alternative, any deviations by the Project are found to be minor within the meaning of Section 5D of Exhibit C . . . ." (Boldface omitted.) Citing this finding, appellants claim "the DRB . . . properly determined that, even if the design of the [CEMEX project] deviated from the design requirements of the governing documents, it could be approved" pursuant to the DRB's authority to make "minor modification[s]." For instance, appellants maintain this provision of the Development Agreement authorized the DRB to approve any deviations between the CEMEX project and the Site Plans included in the Basic Design Concept.

Section 5D of Exhibit C to the Agreement confers upon the DRB "the subjective authority to administratively approve minor modifications to the *Basic Design Concept* subsequent to approval by the Bell City Council, under this Agreement and the Project Entitlements." (Italics added.) Section 5D further provides that "[a]pproval of any minor modification is contingent upon the [DRB] finding that such modification": (1) "is consistent with the maximum total square footage for the Project;" (2) "is in substantial compliance with the fundamental theme, idiom, and design intent of the Basic Design Concept as described in Exhibit C1;" (3) "promotes the Public Benefits outlined in Section K of the Development Agreement;" and (4) "would not

require additional environmental review subject to Section 15162 of the CEQA Guidelines."

Appellants admit that Section 5D of Exhibit C grants the DRB "the authority to approve minor modifications to the *Basic Design Concept*." (Italics added.) The list of Eligible Uses is not found within the Basic Design Concept. The Basic Design Concept is Exhibit C1 to the Development Agreement, whereas the "Eligible Uses" are listed in Exhibit C2 of the Agreement. (Discussion, part A.1, *ante*.) "Eligible Uses" are defined in Exhibit C2.

Admittedly, the "[e]xamples of minor modifications" provided in Section 5D include the following language: "Variances to the Development Standards, including building size or magnitude not more than 10%, except that reductions in size may be subject to approval of the [DRB], except where the [DRB] believes such approval should be within the discretion of the City Council." The Development Standards are in Exhibit C2, and not in the Basic Design Concept in Exhibit C1. The Development Standards include lot dimensions, maximum building height, and the size of off-street parking spaces.

We fail to discern how reliance on Section 5D helps appellants. They do not argue in their briefing that the DRB's authority to make minor modifications extends to the *Eligible Uses* (as opposed to the Development Standards) in Exhibit C2. It is true that the Development Standards and Eligible Uses are two subcategories of Exhibit C2. Although the title of Exhibit C2 reads: "Development Standards and Permitted Land Uses ('Development Standards')," appellants do not assert that the shorthand utilized in the title signifies that the Eligible Uses constitute "Development Standards" subject to the DRB's

authority to make minor modifications. Rather, appellants treat the Development Standards and Eligible Uses as two separate components of Exhibit C2 in their briefing.

In any event, appellants do not claim in their briefing that eliminating the zoning code's requirement for Planning Commission/City Council approval would constitute a "*minor modification*" within the scope of Section 5D of Exhibit C. (Boldface & capitalization omitted; italics added.) Indeed, such an expansive view of the DRB's power would contradict appellants' theory that "the DRB's review was limited to the *aesthetic design*" of the CEMEX project (italics added), and that "[t]here was nothing . . . for the DRB to consider *but the design* because the City long ago approved *the use* [of Parcel A] in the Development Agreement," (italics added). (See *Proctor*, *supra*, 213 Cal.App.4th at pp. 1272–1273 [relying on parties' implicit concessions].)

It necessarily follows that appellants have waived any claim that the DRB could remedy the CEMEX project's noncompliance with the Eligible Uses restriction in the Development Agreement. (See *Golden Door Properties, LLC*, *supra*, 50 Cal.App.5th at p. 555 [" ' "Issues not raised in an appellant's brief are deemed waived or abandoned." ' "]; *Inyo Citizens for Better Planning*, *supra*, 180 Cal.App.4th at p. 14 ["We do not serve as 'backup appellate counsel,' or make the parties' arguments for them."].)

We further note that the Development Agreement expressly confers upon the Planning Commission the authority to permit a deviation from the Eligible Uses by issuing a conditional use permit. That provision further suggests the DRB would not have the power to cure the CEMEX project's violation of the

Agreement's Eligible Uses restriction. (See *Gikas v. Zolin* (1993) 6 Cal.4th 841, 852 ["*Expressio unius est exclusio alterius.* The expression of some things in a statute necessarily means the exclusion of other things not expressed."]; see also *Christian, supra,* 164 Cal.App.4th at p. 551 [holding that contracts are to be "construed in accordance with substantially the same canons of interpretation as statutes"].)

For the foregoing reasons, appellants have not overcome the presumption of correctness accorded to the trial court's judgment in respondents' favor on the first cause of action. (See *Shenouda, supra,* 27 Cal.App.5th at p. 512 ["Because judgments of the trial court are presumed to be correct, the appellant bears the burden to affirmatively demonstrate error, and must show that the error was prejudicial."].)

> 4. *With one exception, we do not reach other claims and subclaims respondents advance in support of the judgment on their first cause of action*

In affirming the judgment on respondents' first cause of action for writ of mandamus, we—with one exception discussed below—express no opinion on the other challenges respondents raise to the DRB's substantial conformance determination. These other claims (even excluding their various attendant subparts) include that: the CEMEX facility does not substantially conform to the Basic Design Concept, the CEMEX facility is inconsistent with the Development Agreement's Conditions of Approval, and the CEMEX facility is inconsistent with the EIR. We decline to decide these issues because our conclusion that the CEMEX project does not satisfy the Eligible Use restriction of the Agreement is a sufficient ground to affirm the trial court's ruling on the first cause of action. In addition, as explained in

38

Discussion, part B, *post*, we have no basis on this record to determine what actions the parties will take in light of our ruling and whether respondents' other challenges regarding substantial conformance would still be relevant depending on such yet to be identified actions.

We do exercise our discretion to address respondents' assertion in their briefing and at oral argument that the Development Agreement authorizes only "a parcel distribution warehouse" on Parcel A. (See *In re D.P.* (2023) 14 Cal.5th 266, 282 (*D.P.*) [holding that "courts may exercise their 'inherent discretion' to reach the merits of" moot questions].) In particular, respondents argue "that [the] Development Agreement contemplated a specific type of use: warehouse distribution centers served by truck . . . ." Respondents intimate that because the three Site plans for Parcel A included in the Basic Design Concept "all . . . portray a large warehouse building occupying most of the site," no proposal for an Eligible Use other than a parcel distribution center could substantially conform to the design requirements of the Basic Design Concept. Respondents seem to go even further, suggesting that the DRB lacked authority to approve a minor modification authorizing a facility other than the large warehouses depicted on the Site plans, given that any such modification could not "substantial[ly] compl[y] with the fundamental theme, idiom, and design intent of the Basic Design Concept . . . ."

We reject the notion that the Agreement restricts the development of Parcel A to only a "FedEx-like warehouse." We must construe the Development Agreement's provisions together, rather than in isolation from one another. (See *Department of Alcoholic Beverage Control v. Alcoholic Beverage*

*Control Appeals Bd.* (2018) 29 Cal.App.5th 410, 418 ["In construing a contract or other written instrument, we consider it 'as a whole and interpret the language in context, rather than interpret a provision in isolation.' "].)  Interpreting the Basic Design Concept as a proscription on any use other than a parcel distribution warehouse would violate that precept by rendering the other Eligible Uses superfluous.  (See *United Farmers Agents Assn., Inc. v. Farmers Group, Inc.* (2019) 32 Cal.App.5th 478, 495 ["We strive to 'give effect to all of a contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable.' "].)  In sum, we hold that a parcel distribution warehouse is not the only type of use permissible on Parcel A.

## B.  Our Affirmance of the Trial Court's Ruling on the Mandamus Cause of Action Moots Appellants' Challenges Vis-à-Vis the CEQA Causes of Action

" 'California courts will decide only justiciable controversies.  [Citations.]  The concept of justiciability is a tenet of common law jurisprudence and embodies "[t]he principle that courts will not entertain an action which is not founded on an actual controversy . . . ." [Citations.]  . . . .' [M]oot cases 'are "[t]hose in which an actual controversy did exist but, by the passage of time or a change in circumstances, ceased to exist." [Citation.]' [Citation.] [¶] . . . 'The pivotal question in determining if a case is moot is . . . whether the court can grant the [party] any effectual relief.  [Citations.] . . . . [Citations.]' [Citations.]"  (See *Parkford Owners for a Better Community v. County of Placer* (2020) 54 Cal.App.5th 714, 722 (*Parkford Owners for a Better Community*).)

"For relief to be 'effective,' two requirements must be met.  First, the [party] must complain of an ongoing harm.  Second, the

40

harm must be redressable or capable of being rectified by the outcome the [party] seeks." (See *D.P.*, *supra*, 14 Cal.5th at p. 276.) "[R]elief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.' [Citation.]" (See *id.* at p. 277.) Allegations of "speculative future harm" are not "sufficient to avoid mootness." (See *id.* at pp. 278, 282.)

Respondents contend that we "need not reach the trial court's ruling on [their] second and third causes of action" if we affirm the judgment in their favor on the first cause of action for writ of mandamus. In support of this contention, respondents claim that affirmance of the disposition of their first cause of action "would require the City to follow the amendment procedures set out in the Development Agreement—and conduct further environmental review of the CEMEX facility under CEQA . . . ." Appellants offer no response to this argument in their reply brief. We agree with respondents to the extent our affirmance of the judgment on the first cause of action moots appellants' challenges to the judgment on the remaining causes of action.

The trial court granted the following relief on respondents' two CEQA causes of action (i.e., the second and third causes of action): "[A] peremptory writ of mandate shall issue providing as follows: [¶] . . . [¶] City of Bell shall: [¶] A. Withdraw and set aside the Bell [DRB]'s Notice of Exemption filed on February 5, 2019 concerning the CEMEX project; [¶] B. Take such additional steps under CEQA as it deems proper; and [¶] C. File a return to the writ confirming that the above-described actions have been taken and/or that a notice of appeal has been filed."

41

We conclude that our affirmance regarding the first cause of action moots the trial court's order requiring the City to set aside the Notice of Exemption. By its terms, the Notice was intended to exempt from CEQA the "adoption of Resolution 2018-23-DRB," which is the DRB's resolution granting design review approval for the CEMEX project. We affirm the trial court's judgment setting aside the substantial conformance determination underlying that resolution. (See Discussion, part A, *ante*.) Because Section 6.2.4 of the Agreement conditions the DRB's authority to grant design approval on the propriety of its substantial conformance determination (see Discussion, part A.1, *ante*), the DRB's resolution is no longer valid. Indeed, according to appellants' interpretation of the judgment, the trial court "ordered that the DRB's *approval* be set aside." (Italics added.) Given that the Notice of Exemption now pertains to an invalid DRB resolution, that Notice can have no practical or tangible impact on the parties' conduct or legal status.

Because we do not know what steps the parties will take given that the DRB resolution is now invalid, it would not be appropriate for us to opine on whether the trial court erred in ordering the City to "[t]ake such additional steps under CEQA as [the City] deems proper." We do not know whether CEMEX will seek approvals from the Planning Commission and City Council to be able to maintain its current use of Parcel A, and whether CEQA would require City officials to undertake further environmental review as part of any such approval process. If the City requires changes to the CEMEX project as a condition of

approval,[19] that decision could trigger the City's obligation to conduct further environmental review even in the absence of the trial court's judgment on the CEQA claims.  (See CEQA Guidelines, § 15162, subd. (a)(1) [requiring a subsequent EIR to be prepared if "[s]ubstantial changes are proposed in the project which will require major revisions of the previous EIR . . . due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects"].)

We do not know whether CEMEX will seek an ordinance amending the Development Agreement pursuant to Section 7.2 thereof to permit an uncovered storage facility, and whether the City will impose new conditions in such an ordinance that could implicate further CEQA review.

We are thus loathe to render an advisory opinion on CEQA obligations when we have no information as to how Parcel A will be used in light of our ruling in favor of respondents on the first cause of action.  For all these reasons, we conclude that appellants' challenges to the trial court's judgment on the second and third causes of action are moot.  (Cf. *In re Briana V.* (2015) 236 Cal.App.4th 297, 299, 308, 311–312 [indicating that an appellate court's affirmance of one aspect of an appealed order can, under certain circumstances, render nonjusticiable an

---

**19** The City has required changes to the CEMEX project in the past.  Specifically, appellants admit that after East Yard challenged the prior iteration of the project, appellants entered into a settlement requiring that changes be made to CEMEX's proposal, including the inclusion of a "fully enclose[d] . . . conveyor system [and the] implement[ation of] a dust control and storm water plan . . . ."

43

appellant's challenge to other portions of that order].) Additionally, because respondents conceded in their briefing that our affirmance on the first cause of action would moot appellants' challenges to the second and third causes of action, and appellants make no argument to the contrary in their briefing, we decline to decide whether the trial court's rulings on the CEQA causes of action were erroneous. (See *Parkford Owners for a Better Community*, *supra*, 54 Cal.App.5th at p. 721 [indicating that an appellant's "burden of demonstrating reversible error" includes an obligation to rebut a persuasive claim of mootness].)

We turn next to the proper disposition of the judgment on respondents' second and third causes of action. " ' "As a general rule, 'an appeal presenting only abstract or academic questions is subject to dismissal as moot.' [Citation.]" [Citation.]' [Citation.]" (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 120.) A different disposition is appropriate "[i]n some instances, however . . . ." (See *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1054–1055 (*Delta Stewardship Council Cases*).) Specifically, "[w]hen the basis for the trial court's judgment becomes nonexistent due to postjudgment acts or events [(i.e., when the judgment itself has become moot)], an appellate court should ' "dispose of the case, not merely of the appellate proceeding which brought it here." [Citation.] That result can be achieved by reversing the judgment solely for the purpose of restoring the matter to the jurisdiction of the superior court, with directions to the court to dismiss the proceeding. [Citations.] Such a reversal, of course, does not imply approval of a contrary judgment, but is merely a procedural step necessary to a proper disposition of th[e] case.' [Citation.]" (See *id.* at p. 1055.)

44

Our affirmance on the first cause of action not only moots appellants' challenges regarding the second and third causes of action, but also the judgment adjudicating those two CEQA claims. Upon the issuance of our remittitur, the trial court will be empowered to enforce the portion of the judgment requiring the City to set aside the DRB's approval of the CEMEX project.[20] As we explained earlier in this part, setting aside the DRB's decision (a) nullifies the legal significance of the Notice of Exemption; and (b) allows the parties to undertake numerous potential courses of action in connection with CEMEX's use of Parcel A, thereby rendering an analysis of the City's CEQA obligations—including the trial court's ruling on those issues—an advisory opinion.

Accordingly, we reverse the trial court's judgment on the second and third causes of action, and remand the matter to the trial court for the purpose of "vacating [those aspects of the] judgment[ ] solely on the ground of mootness." (See *Delta Stewardship Council Cases*, *supra*, 48 Cal.App.5th at pp. 1055–1056 [utilizing this disposition].) "In following this procedure, we . . . appropriately avoid affirming th[ose portions of the] judgment[ ] by implication." (See *id*. at p. 1056.) We express no opinion on whether the judgment on those two causes of action was erroneous. (See *id*. at pp. 1055–1056.)

---

**20** (See *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1499 ["Generally the filing of a notice of appeal deprives the trial court of jurisdiction of the cause and vests jurisdiction with the appellate court until the reviewing court issues a remittitur."], citing, inter alia, Code Civ. Proc., § 916, subd. (a) ["[T]he perfecting of an appeal stays . . . enforcement of the [appealed] judgment . . . ."].)

## DISPOSITION

We affirm the judgment in respondents' favor on the first cause of action for writ of administrative mandamus. We reverse the judgment on respondents' second and third causes of action, and remand this matter to the trial court with directions to vacate as moot the judgment on those two causes of action. We express no opinion on whether the trial court erred regarding the second and third causes of action. Respondents are awarded their costs on appeal.

NOT TO BE PUBLISHED.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



WEINGART, J.